The Honorable Parren J.
MITCHELL et al.,
Appellants,

v.

Melvin R. LAIRD et al.

No. 71–1510.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 6, 1972.

Decided March 20, 1973.

Rehearing En Banc Denied June 21, 1973.

612

Lawrence R. Velvel, Washington, D. C., with whom Stefan Tucker and Christopher Sanger, Washington, D. C., were on the brief, for appellants.

Gregory Brady, Asst. U. S. Atty. with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Michael A. Katz, Asst. U. S. Attys. and Hermine Herta Meyer, Atty., Dept. of Justice, were on the brief, for appellees. Thomas A. Flannery, U. S. Atty. at the time the record was filed and Walter H. Fleischer, Atty., Dept. of Justice, also entered appearances for appellees.

Before BAZELON, ·Chief Judge, TAMM, Circuit Judge, and WYZANSKI,* Senior United States District Judge for the District of Massachusetts.

* Sitting by designation pursuant to Title 28, U.S.C. § 294(d).

WYZANSKI, Senior District Judge:

April 7, 1971 thirteen members of the United States House of Representatives, as plaintiffs, filed in the District Court a complaint against the President of the United States, the Secretaries of State, Defense, Army, Navy, and Air Force, and the United States of America. Plaintiffs alleged that for seven years the United States, by the named individual defendants and their predecessors, has been engaged in a war in Indo-China without obtaining "either a declaration of war or an explicit, intentional and discrete authorization of war" and thereby "unlawfully impair and defeat plaintiffs' Constitutional right, as members of the Congress of the United States, to decide whether the United States should fight a war." Plaintiffs prayed for first, an order that defendants be enjoined from prosecuting the war in Indo-China unless, within 60 days from the date of such order, the Congress shall have explicitly, intentionally and discretely authorized a continuation of the war, and, second, "a declaratory judgment that defendants are carrying on a war in violation of Article I, Section 8, Clause 11 of the United States Constitution."

The District Court dismissed the action as to the President, on the authority of Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866), and as to the other defendants, on the authority of Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664 (1967), cert. denied 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967).

By somewhat different paths, the three judges who have heard this appeal from the District Court's judgment of dismissal have concluded unanimously that said appeal should be dismissed.

■ The first issue presented is whether the case is now moot. Recently, the President has purported formally to end hostilities in Vietnam and Laos. There has been no similar action with respect to Cambodia, another part of Indo-China. The continuation of hostilities there precludes our holding that this case is moot. Furthermore, a declaratory judgment respecting past action might have legal import, inasmuch as though this point is not specifically pleaded, plaintiffs have a duty under the Constitution to consider whether defendants in continuing the hostilities did commit high crimes and misdemeanors so as to justify an impeachment of the individual defendants, pursuant to United States Constitution, Article I, Section 2, Clause 5.

■ The second issue is whether the dismissal of the action against the United States was correct for a reason not given by the District Court. We are unanimously of the view that as to the government the dismissal was correct because the sovereign has not consented to be sued.

The third issue is whether the dismissal of the action as to the remaining defendants was proper for another reason not given by the District Court: to wit, that plaintiffs have no standing to sue. None of the judges who heard this appeal is persuaded that plaintiffs are sound in their explicit reliance upon defendants' alleged duty not to interfere with what the complaint alleges is "plaintiffs' Constitutional right, as members of the Congress of the United States, to decide whether the United States should fight a war."

■ Implicit in plaintiffs' contention is their assumption that the Constitution gives to the Congress the *exclusive* right to decide whether the United States should fight *all* types of war. Without at this point exhaustively considering all possibilities, we are unanimously of the opinion that there are some types of war which, without Congressional approval, the President may begin to wage: for example, he may respond immediately without such approval to a belligerent attack, or in a grave emergency he may, without Congressional approval, take the initiative to wage war. Otherwise the country would be paralyzed. Before

Congress could act the nation might be defeated or at least crippled. In such unusual situations necessity confers the requisite authority upon the President. Any other construction of the Constitution would make it self-destructive.

█ However, plaintiffs are not limited by their own concepts of their standing to sue. We perceive that in respects which they have not alleged they may be entitled to complain. If we, for the moment, assume that defendants' actions in continuing the hostilities in Indo-China were or are beyond the authority conferred upon them by the Constitution, a declaration to that effect would bear upon the duties of plaintiffs to consider whether to impeach defendants, and upon plaintiffs' quite distinct and different duties to make appropriations to support the hostilities, or to take other legislative actions related to such hostilities, such as raising an army or enacting other civil or criminal legislation. In our view, these considerations are sufficient to give plaintiffs a standing to make their complaint. Cf. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L. Ed.2d 192 (1970).

[5] The fourth issue is whether plaintiffs seek adjudication of a "political question" beyond the jurisdiction conferred upon the courts by Article III of the Constitution. Despite Luftig v. McNamara, *supra*, which admittedly indicates that it is beyond judicial competence to determine the allocation, between the executive and the legislative branches, of the powers to wage war, we are now persuaded that there may be, in some cases, such competence. Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971), aff'g s. c. 327 F.Supp. 378 (D. Mass.1971); Orlando v. Laird, 443 F.2d 1039 (2nd Cir. 1971). Cf. Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

Here the critical question to be initially decided is whether the hostilities in Indo-China constitute in the Constitutional sense a "war," both within and beyond the meaning of that term in Article I, Section 8, Clause 11. That the hostilities have been not merely of magnitude but also of long duration is plainly alleged in paragraph 4 of the complaint. It is there said that "For at least the last seven years . . . the United States . . . has been engaged in Indo-China in the prosecution of the longest and one of the most costly wars in American history. As of the present, one million human beings, including over 50,000 Americans have been killed in the war, and at least one hundred billion dollars has been spent by the United States in and for the prosecution of the war." There would be no insuperable difficulty in a court determining whether such allegations are substantially true. If they are, then in our opinion, as apparently in the opinion of President Nixon, as revealed by his use of the word "war" in his second Inaugural Address, delivered January 20, 1973, there has been a war in Indo-China. Nor do we see any difficulty in a court facing up to the question as to whether because of the war's duration and magnitude the President is or was without power to continue the war without Congressional approval.

But the aforesaid question invites inquiry as to whether Congress has given, in a Constitutionally satisfactory form, the approval requisite for a war of considerable duration and magnitude. Originally Congress gave what may be argued to have been its approval by the passage of the Gulf of Tonkin Resolution, 78 Stat. 384 (1964). See Orlando v. Laird, *supra*. However, that resolution cannot serve as justification for the *indefinite* continuance of the war since it was repealed by subsequent Congressional action, 84 Stat. 2055 (1971). Apparently recognizing that point, the Government contends that Congressional approval has been given by appropriation acts, by extension of the Selective Serv-

ice and Training Act, and by other measures.

We are unanimously agreed that it is constitutionally permissible for Congress to use·another means than a formal declaration of war to give its approval to a war such as is involved in the protracted and substantial hostilities in Indo-China. See Massachusetts v. Laird and Orlando v. Laird, both *supra*. Any attempt to require a declaration of war as the only permissible form of assent might involve unforeseeable domestic and international consequences, without any obvious compensating advantages other than that a formal declaration of war does have special solemnity and does present to the legislature an unambiguous choice. While those advantages are not negligible, we deem it a political question, or, to phrase it more accurately, a discretionary matter for Congress to decide in which form, if any, it will give its consent to the continuation of a war already begun by a President acting alone. See Massachusetts v. Laird, *supra*, aff'g s. c., 327 F.Supp. 378 (D. Mass.1971); Orlando v. Laird, *supra*; Berk v. Laird, 317 F.Supp. 715 (E.D.N. Y.1970). That is, we regard the Constitution as contemplating various forms of Congressional assent, and we do not find any authority in the courts to require Congress to employ one rather than another form, if the form chosen by Congress be in itself constitutionally permissible. That conclusion, however, leaves unanswered the further question whether the particular forms which the Government counsel at our bar refer to as having been used by Congress in the Indo-China war are themselves of that character which makes them *in toto*, if not separately, a constitutionally permissible form of assent.

The overwhelming weight of authority, including some earlier opinions by the present writer, holds that the appropriation, draft extension, and cognate laws enacted with direct or indirect reference to the Indo-China war, (and which have been acutely and comprehensively analyzed by Judge Judd in Berk v. Laird, *supra*) did constitute a constitutionally permissible form of assent. Massachusetts v. Laird, Orlando v. Laird, Berk v. Laird, all *supra*, and United States v. Sisson, 294 F.Supp. 511 (D.Mass.1968). Judge Tamm is content to adhere to that line of authority.

But Chief Judge Bazelon and I now regard that body of authority as unsound. It is, of course, elementary that in many areas of the law appropriations by Congress have been construed by the courts as involving Congressional assent to, or ratification of, prior or continuing executive action originally undertaken without Congressional legislative approval. Without a pause to cite or to examine in detail the vast body of cases involving such construction, it is more relevant to emphasize the special problem which is presented when one seeks to spell out from military appropriation acts, extensions of selective · service laws, and cognate legislation the purported Congressional approval or ratification of a war already being waged at the direction of the President alone. This court cannot be unmindful of what every schoolboy knows: that in voting to appropriate money or to draft men a Congressman is not necessarily approving of the continuation of a war no matter how specifically the appropriation or draft act refers to that war. A Congressman wholly opposed to the war's commencement and continuation might vote for the military appropriations and for the draft measures because he was unwilling to abandon without support men already fighting. An honorable, decent, compassionate act of aiding those already in peril is no proof of consent to the actions that placed and continued them in that dangerous posture. We should not construe votes cast in pity and piety as though they were votes freely given to express consent. Hence Chief Judge Bazelon and I believe that none of the legislation drawn to the court's attention may serve as a valid assent to the Vietnam war.

Yet it does not follow that plaintiffs are entitled to prevail. When on Janu-

ary 20, 1969 President Nixon took office, and when on the same or even later dates the other individual defendants took their present offices, they were faced with a belligerent situation not of their creation. Obviously, the President could not properly execute the duties of his office or his responsibility as Commander-in-Chief by ordering hostilities to cease on the very day he took office. Even if his predecessors had exceeded their constitutional authority, President Nixon's duty did not go beyond trying, in good faith and to the best of his ability, to bring the war to an end as promptly as was consistent with the safety of those fighting and with a profound concern for the durable interests of the nation—its defense, its honor, its morality.

 Whether President Nixon did so proceed is a question which at this stage in history a court is incompetent to answer. A court cannot procure the relevant evidence: some is in the hands of foreign governments, some is privileged. Even if the necessary facts were to be laid before it, a court would not substitute its judgment for that of the President, who has an unusually wide measure of discretion in this area, and who should not be judicially condemned except in a case of clear abuse amounting to bad faith. Otherwise a court would be ignoring the delicacies of diplomatic negotiation, the inevitable bargaining for the best solution of an international conflict, and the scope which in foreign affairs must be allowed to the President if this country is to play a responsible role in the council of the nations.

In short, we are faced with what has traditionally been called a "political question" which is beyond the judicial power conferred by Article III of the United States Constitution. And on that ground the complaint was properly dismissed by the District Court.

Appeal dismissed.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

PER CURIAM.

The motion for rehearing *en banc* initiated by a member of the Court in regular active service is denied, a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure).

Separate statement by Circuit Judge MacKINNON with whom Circuit Judges TAMM, ROBB and WILKEY join as to why they would grant rehearing *en banc*, *sua sponte*.

MacKINNON, Circuit Judge:

I would vote *sua sponte* for rehearing *en banc* of this case to correct the manifest error to which Judge Tamm also dissents in the above opinion. My objection runs to pages 615–616 of the slip opinion which state, *inter alia*, that appropriations, extensions of the draft and other legislation by Congress supporting the Indochina war do *not* constitute assent to the war. This statement, which is implicitly self-contradictory, fails to give full recognition to the so-called Gulf of Tonkin Resolution which was passed on August 10, 1964 by both Houses of Congress by a cumulative vote of 506 to 2. The Resolution declared, *inter alia*:

> Consonant with the Constitution of the United States and the Charter of the United Nations and in accordance with its obligations under the Southeast Asia Collective Defense Treaty, the United States is to be prepared, as the President determines, to take all necessary steps, *including the use of armed force,* to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting

assistance in defense of its freedom. (Emphasis added.) [1]

This Resolution clearly authorized and thereby approved and consented to "the use of armed force" in Southeast Asia. Congress terminated this Resolution effective January 2, 1971,[2] but it is impossible as a practical matter to "undeclare" a war in this manner. By subsequently appropriating money [3] for military forces and materiel with restriction on operations in Laos and Thailand but with no restriction on operations in Vietnam and Cambodia,[4] Congress impliedly recognized that the war could not be undone completely by terminating the Gulf of Tonkin Resolution. The appropriations thus indicate Congress' continuing assent to the prosecution of the war.

The basis stated by the opinion for the self-contradictory statement that Congress in passing measures to support the

---

1. Public Law 88–408, Aug. 10, 1964, provides:

JOINT RESOLUTION

To promote the maintenance of international peace and security in southeast Asia.

Whereas naval units of the Communist regime in Vietnam, in violation of the principles of the Charter of the United Nations and of international law, have deliberately and repeatedly attacked United States naval vessels lawfully present in international waters, and have thereby created a serious threat to international peace; and

Whereas these attacks are part of a deliberate and systematic campaign of aggression that the Communist regime in North Vietnam has been waging against its neighbors and the nations joined with them in the collective defense of their freedom; and

Whereas the United States is assisting the peoples of southeast Asia to protect their freedom and has no territorial, military or political ambitions in that area, but desires only that these peoples should be left in peace to work out their own destinies in their own way: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Congress approves and supports the determination of the President, as Commander in Chief, to take all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression.

Sec. 2. The United States regards as vital to its national interest and to world peace the maintenance of international peace and security in southeast Asia. Consonant with the Constitution of the United States and the Charter of the United Nations and in accordance with its obligations under the Southeast Asia Collective Defense Treaty, the United States is, therefore, prepared, as the President determines, to take all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom.

Sec. 3. This resolution shall expire when the President shall determine that the peace and security of the area is reasonably assured by international conditions created by action of the United Nations or otherwise, except that it may be terminated earlier by concurrent resolution of the Congress.

Approved August 10, 1964.

78 Stat. 384.

2. On January 12, 1971, the 91st Congress enacted a section in the Foreign Military Sales Act providing:

Sec. 12. The joint resolution entitled "Joint resolution to promote the maintenance of international peace and security in Southeast Asia", approved August 10, 1964 (78 Stat. 384; Public Law 88–408), is terminated effective upon the day that the second session of the Ninety-first Congress is last adjourned.

Pub.L. 91–672, Jan. 12, 1971, 84 Stat. 2055. The Second Session of the 91st Congress last adjourned sine die on January 2, 1971 (116 Cong.Rec. 44640), Under the terms of the above section the Gulf of Tonkin Resolution became effective on January 2, 1971, which was ten days before the Act terminating it was approved.

3. Pub. L. No. 92–204, Dec. 18, 1971, 85 Stat. 716.

4. *Id.,* 85 Stat. at 735.

Vietnam war was not validly assenting thereto is that:

> This court cannot be unmindful of what every schoolboy knows [5]: that in voting to appropriate money or to draft men a Congressman is not necessarily approving the continuation of a war no matter how specifically the appropriation or draft act refers to that war. A Congressman wholly opposed to the war's commencement and continuation *might* vote for the military appropriations and for the draft measures because he was unwilling to abandon without support men already fighting. An honorable, decent, compassionate act of aiding those already in peril is no proof of consent to the actions that placed and continued them in that dangerous posture. We should not construe votes cast in pity and piety as though they were votes freely given to express consent. Hence Chief Judge Bazelon and I believe that none of the legislation drawn to the court's attention may serve as a valid assent to the Vietnam war. (Emphasis added.)

In my opinion, contrary to the above quotation, the annual multi-billion dollar appropriations over an eight-year period reflect a clear Congressional assent to the war. The appropriations were intended both for future activities, as with the regular annual appropriations, and for current activities, as with the supplemental appropriations.[6] Congress was not acting blindly. The annual appropriations followed extensive hearings which disclosed precisely that the money was being used for military operations in the Vietnam conflict. Congress even went so far as to earmark some appropriations for "military activities in Southeast Asia"[7] and "to provide all necessary support for members of the Armed Forces of the United States fighting in Vietnam."[8] To state that Congress did not thereby assent to the war is to disregard the obvious Congressional intent on this very important matter. Continuing the war would have been impossible without the consent which Congress manifested in the only meaningful way that Congress acts—by formally adopted enactments.

The primary error in the panel opinion is that it confuses the expressed *intent* of Congress with what is completely court-created speculation as to *motive*. Intent and motive are not the same. Even if courts possessed authority and jurisdiction to inquire into the motives of Congress, which they do not,[9] the panel opinion only asserts a possible *speculative* motive, i. e., what "A Congressman [not even a majority of either House of Congress] . . . *might* vote." (Emphasis added.) This irrational and illusory base has no support in the record and is not proper support for a responsible judicial decision. I would thus excise the heretofore quoted portion of the opinion. As recently as April 2, 1973, the Supreme Court affirmed a decision which noted the "political nature" of the questions involved.[10] In view of the now complete removal of United States ground forces, the quoted language of the opinion is nothing more than a court-created *post hoc* rationalization, devoid of any support in the record, which is obviously so untimely, illogical and political that it should not form any part of a judicial opinion. Otherwise, I concur in the result reached by the opinion.

5. This is not generally considered to be reliable authority.

6. E.g., Act of March 25, 1966, 80 Stat. 79.

7. Pub.L. 89-18, May 7, 1965, 79 Stat. 109; ·Orlando v. Laird, 443 F.2d 1039, 1042 n. 2 (2d Cir. 1971).

8. Pub.L. 90-5, March 16, 1967, 81 Stat. 5; Orlando v. Laird, *supra* at 1042 n. 2.

9. Courts are not empowered to pass upon the motives that cause legislative bodies to act upon legislation. Fletcher v. Peck, 10 U.S.(6 Cranch) 87, 129–131, 3 L.Ed. 162 (1810); D.C.Federation of Civic Associations v. Volpe, 148 U.S. App.D.C. 207, 223, 459 F.2d 1231, 1247 (1971), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972).

10. Atlee v. Richardson, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973), affirming Atlee v. Laird, 339 F.Supp. 1347 (E.D.Pa.1972).