**Ronald V. DELLUMS, et al., Plaintiffs,**

v.

**George BUSH, Defendant.**

**Civ. A. No. 90–2866 (HHG).**

United States District Court,
District of Columbia.

Dec. 13, 1990.

Jules Lobel, Michael Ratner, Beth Stephens, Peter Weiss, Jose Luis Morin, Franklin Siegel, New York City, James Klimaski, Douglas Smith, Lynn Miller, Klimaski, Miller & Smith, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Leslie H. Southwick, Deputy Asst. Atty. Gen., David J. Anderson, Vincent M. Garvey, Paul Herrup, Eric Goulian, John Tyler, Attys., Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Bruce A. Ackerman, Abram Chayes, Lori Fisler Damrosch, John Hart Ely, Erwin N. Griswold, Gerald Gunther, Louis Henkin, Harold Hongju Koh, Philip B. Kurland, Laurence H. Tribe, William W. Van Alstyne, c/o Harold Hongju Koh, New Haven, Conn., for amicus curiae Law Professors.

Michael J. Glennon, University of California, Davis, Cal., Kate Martin, Gary M. Stern, Howard A. Pincus, American Civil Liberties Union Foundation, Washington, D.C., for amicus curiae American Civil Liberties Union Foundation.

## OPINION

HAROLD H. GREENE, District Judge.

This is a lawsuit by a number of members of Congress [1] who request an injunction directed to the President of the United States to prevent him from initiating an offensive attack against Iraq without first securing a declaration of war or other explicit congressional authorization for such action.

I

The factual background is, briefly, as follows. On August 2, 1990, Iraq invaded the neighboring country of Kuwait. President George Bush almost immediately sent United States military forces to the Persian Gulf area to deter Iraqi aggression and to preserve the integrity of Saudi Arabia. The United States, generally by presidential order and at times with congressional concurrence, also took other steps, including a blockade of Iraq, which were approved by the United Nations Security Council, and participated in by a great many other nations.

On November 8, 1990, President Bush announced a substantial increase in the Persian Gulf military deployment, raising the troop level significantly above the 230,000 then present in the area. At the same time, the President stated that the objective was to provide "an adequate *offensive* military option" should that be necessary to achieve such goals as the withdrawal of Iraqi forces from Kuwait. Secretary of Defense Richard Cheney likewise referred to the ability of the additional military forces "to conduct *offensive* military operations."

The House of Representatives and the Senate have in various ways expressed their support for the President's past and present actions in the Persian Gulf. However, the Congress was not asked for, and

**1.** The plaintiffs are fifty-three Members of the House of Representatives and one United States Senator.

it did not take, action pursuant to Article I, Section 8, Clause 11 of the Constitution "to declare war" on Iraq. On November 19, 1990, the congressional plaintiffs brought this action, which proceeds on the premise that the initiation of offensive United States military action is imminent, that such action would be unlawful in the absence of a declaration of war by the Congress, and that a war without concurrence by the Congress would deprive the congressional plaintiffs of the voice to which they are entitled under the Constitution. The Department of Justice, acting on behalf of the President, is opposing the motion for preliminary injunction, and it has also moved to dismiss.[2] Plaintiffs thereafter moved for summary judgment.[3]

The Department raises a number of defenses to the lawsuit—most particularly that the complaint presents a non-justiciable political question, that plaintiffs lack standing to maintain the action, that their claim violates established canons of equity jurisprudence, and that the issue of the proper allocation of the war making powers between the branches is not ripe for decision. These will now be considered seriatim.

## II  *Political Question*

It is appropriate first to sketch out briefly the constitutional and legal framework in which the current controversy arises. Article I, Section 8, Clause 11 of the Consti-

tution grants to the Congress the power "To declare War."[4] To the extent that this unambiguous direction requires construction or explanation,[5] it is provided by the framers' comments that they felt it to be unwise to entrust the momentous power to involve the nation in a war to the President alone;[6] Jefferson explained that he desired "an effectual check to the Dog of war";[7] James Wilson similarly expressed the expectation that this system would guard against hostilities being initiated by a single man.[8] Even Abraham Lincoln, while a Congressman, said more than half a century later that "*no one man* should hold the power of bringing" war upon us.[9]

The congressional power to declare war does not stand alone, however, but it is accompanied by powers granted to the President. Article II, Section 1, Clause 1 and Section 2 provide that "[t]he executive powers shall be vested in a President of the United States of America," and that "[t]he President shall be Commander in Chief of the Army and Navy...."

It is the position of the Department of Justice on behalf of the President that the simultaneous existence of all these provisions renders it impossible to isolate the war-declaring power. The Department further argues that the design of the Constitution is to have the various war- and military-related provisions construed and acting together, and that their harmonization

---

**2.** A number of prominent law professors filed a memorandum as *amicus curiae* in support of plaintiffs' position, as did also the American Civil Liberties Union.

**3.** The summary judgment motion is not yet ripe.

**4.** Under Article I, Section 8, Congress also has the power to "raise and support armies," "provide and maintain a navy," and "make rules of *the government and regulation of the land and naval forces*." The Congress also has the power to make "all laws which shall be necessary and proper for carrying into execution" its enumerated powers.

**5.** While the Constitution itself speaks only of the congressional power to declare war, it is silent on the issue of the effect of a congressional vote that war not be initiated. However, if the War Clause is to have its normal meaning, it excludes from the power to declare war all

branches other than the Congress. It also follows that if the Congress decides that United States forces should not be employed in foreign hostilities, and if the Executive does not of its own volition abandon participation in such hostilities, action by the courts would appear to be the only available means to break the deadlock in favor of the constitutional provision.

**6.** *See* The Federalist No. 75 at 506 (A. Hamilton) (J. Cooke ed. 1961).

**7.** *The Papers of Thomas Jefferson* 397 (J. Boyd, ed. 1951).

**8.** 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution in 1787* 528 (J. Elliott, 2d ed. 1836).

**9.** 1 *The Collected Works of Abraham Lincoln* 452 (R. Basler, ed. 1953) (letter to William H. Herndon) (emphasis in original).

is a political rather than a legal question. In short, the Department relies on the political question doctrine.

That doctrine is premised both upon the separation of powers and the inherent limits of judicial abilities. *See generally, Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). In relation to the issues involved in this case, the Department of Justice expands on its basic theme, contending that by their very nature the determination whether certain types of military actions require a declaration of war is not justiciable, but depends instead upon delicate judgments by the political branches. On that view, the question whether an offensive action taken by American armed forces constitutes an act of war (to be initiated by a declaration of war) or an "offensive military attack" (presumably undertaken by the President in his capacity as commander-in-chief) is not one of objective fact but involves an exercise of judgment based upon all the vagaries of foreign affairs and national security. Motion to Dismiss at 1150. Indeed, the Department contends that there are no judicially discoverable and manageable standards to apply, claiming that only the political branches are able to determine whether or not this country is at war. Such a determination, it is said, is based upon "a political judgment" about the significance of those facts. Under that rationale, a court cannot make an independent determination on this issue because it cannot take adequate account of these political considerations.

This claim on behalf of the Executive [10] is far too sweeping to be accepted by the courts.[11] If the Executive had the sole power to determine that any particular offensive military operation, no matter how vast, does not constitute war-making but only an offensive military attack, the congressional power to declare war will be at the mercy of a semantic decision by the Executive. Such an "interpretation" would evade the plain language of the Constitution, and it cannot stand.

That is not to say that, assuming that the issue is factually close or ambiguous or fraught with intricate technical military and diplomatic baggage, the courts would not defer to the political branches to determine whether or not particular hostilities might qualify as a "war." However, here the forces involved are of such magnitude and significance as to present no serious claim that a war would not ensue if they became engaged in combat, and it is therefore clear that congressional approval is required if Congress desires to become involved.

■ *Mitchell v. Laird,* 488 F.2d 611, 614 (D.C.Cir.1973), is instructive in that regard. In *Mitchell,* the Court of Appeals for this Circuit ruled there is "no insuperable difficulty in a court determining" the truth of the factual allegations in the complaint: that many Americans had been killed and large amounts of money had been spent in military activity in Indo–China. In the view of the appellate court, by looking at those facts a court could determine "whether the hostilities in Indo–China constitute[d] ... a 'war,' ... within ... the meaning of that term in Article I, Section 8, Clause 11." 488 F.2d at 614. Said the Court:

> Here the critical question to be initially decided is whether the hostilities in Indo–China constitute in the Constitutional sense a "war" ... [If the plaintiffs' allegations are true,] then in our opinion, as apparently in the opinion of President Nixon, ... there has been a war in Indo–China. Nor do we see any difficulty in a court facing up to the question as to whether because of the war's duration

---

**10.** While the Department refers to the "political branches" in the plural, it is apparent from the context that the claim is that the Executive is deemed to be the branch which will make the decision.

**11.** The principal decision cited in support of the Department's claim is *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952). But not only did that case involve a resident alien (not a military issue) but the President's action in deporting resident aliens was explicitly authorized by the Congress.

and magnitude the President is or was without power to continue the war without Congressional approval. 488 F.2d at 614. In short, *Mitchell* stands for the proposition that courts do not lack the power and the ability to make the factual and legal determination of whether this nation's military actions constitute war for purposes of the constitutional War Clause.[12] *See also, Orlando v. Laird,* 443 F.2d 1039 (2d Cir.1971); *Berk v. Laird,* 429 F.2d 302 (2d Cir.1970).

Notwithstanding these relatively straightforward propositions, the Department goes on to suggest that the issue in this case is still political rather than legal, because in order to resolve the dispute the Court would have to inject itself into foreign affairs, a subject which the Constitution commits to the political branches. That argument, too, must fail.

■ While the Constitution grants to the political branches, and in particular to the Executive, responsibility for conducting the nation's foreign affairs, it does not follow that the judicial power is excluded from the resolution of cases merely because they may touch upon such affairs. The court must instead look at "the particular question posed" in the case. *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 707. In fact, courts are routinely deciding cases that touch upon or even have a substantial impact on foreign and defense policy. *Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *Youngstown Sheet &*

*Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

The Department's argument also ignores the fact that courts have historically made determinations about whether this country was at war for many other purposes—the construction of treaties, statutes, and even insurance contracts.[13] These judicial determinations of a de facto state of war have occurred even in the absence of a congressional declaration.[14]

Plaintiffs allege in their complaint that 230,000 American troops are currently deployed in Saudi Arabia and the Persian Gulf area, and that by the end of this month the number of American troops in the region will reach 380,000. They also allege, in light of the President's obtaining the support of the United Nations Security Council in a resolution allowing for the use of force against Iraq, that he is planning for an offensive military attack on Iraqi forces.

Given these factual allegations and the legal principles outlined above, the Court has no hesitation in concluding that an offensive entry into Iraq by several hundred thousand United States servicemen under the conditions described above could be described as a "war" within the meaning of Article I, Section 8, Clause 11, of the Constitution. To put it another way: the Court is not prepared to read out of the Constitution the clause granting to the Congress, and to it alone, the authority "to declare war."

---

**12.** The *Mitchell* court found that the hostilities in Vietnam constituted a war for purposes of Article I, Section 8, Clause 11, and that Congress had not authorized the President's unilateral conduct of that war. However, the court went on to hold that under these circumstances the President's only duty was "to bring the war to an end." 488 F.2d at 616. The factual determination of whether at the particular time the President was bringing the war to an end or continuing it was held to be a political question for which there were no judicially manageable standards to apply.

**13.** *See, e.g., New York Life Ins. Co. v. Bennion,* 158 F.2d 260 (10th Cir.1946).

**14.** In the *Prize Cases,* 67 U.S. 635, 17 L.Ed. 459 (1863), the Court was asked to determine whether the Civil War, which Congress had never officially declared to be a war, constituted a war for the purpose of determining whether the right of prize existed. The owners of the captured ships claimed that the Civil War was not a war because it had not been officially declared. The Court responded that they "cannot ask a court to affect a technical ignorance of the existence of a war, which all the world acknowledges to be the greatest civil war known in the history of the human race." 67 U.S. at 669.

## III  *Standing*

The Department of Justice argues next that the plaintiffs lack "standing" to pursue this action.

■ The Supreme Court has established a two-part test for determining standing under Article III of the Constitution. The plaintiff must allege: (1) that he personally suffered actual or threatened injury, and (2) that the "injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). For the purpose of determining standing on a motion to dismiss, the Court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Accordingly, plaintiffs' allegations of an imminent danger of hostilities between the United States forces and Iraq must be accepted as true for this purpose.

Plaintiffs further claim that their interest guaranteed by the War Clause of the Constitution is in immediate danger of being harmed by military actions the President may take against Iraq. That claim states a legally-cognizable injury, for as the Court of Appeals for this Circuit stated in a leading case, members of Congress plainly have an interest in protecting their right to vote on matters entrusted to their respective chambers by the Constitution. *Moore v. United States House of Representatives,* 733 F.2d 946, 950 (D.C.Cir. 1984). Indeed, *Moore* pointed out even more explicitly that where a congressional plaintiff suffers "unconstitutional deprivations of [his] constitutional duties or rights ... if the injuries are specific and discerni-

ble," a finding of harm sufficient to support standing is justified. *Id.* at 952 (footnote omitted). *See also, Humphrey v. Baker,* 848 F.2d 211 (D.C.Cir.1988); *Melcher v. Federal Open Market Committee,* 836 F.2d 561 (D.C.Cir.1987); *Gregg v. Barrett,* 771 F.2d 539 (1985).

To be sure, *Moore* and other decisions have found standing by members of Congress to challenge the Executive for actions the latter had already taken,[15] and the Department of Justice argues that these precedents do not apply where, as here, the subject of the suit are Executive actions that are only threatened. Especially in view of the extraordinary fact situation that is before the Court, that is a distinction without a difference.

■ When future harm is alleged as injury-in-fact, the plaintiff must be able to allege harm that is "both 'real and immediate' not 'conjectural' or 'hypothetical.'" *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (citation omitted). Yet that plaintiff does not have to wait for the threatened harm to occur before obtaining standing. *Blum v. Yaretsky,* 457 U.S. 991, 1001–2, 102 S.Ct. 2777, 2784–85, 73 L.Ed.2d 534 (1982).

■ The right asserted by the plaintiffs in this case is the right to vote for or against a declaration of war. In view of that subject matter, the right must of necessity be asserted before the President acts; once the President has acted, the asserted right of the members of Congress—to render war action by the President contingent upon a prior congressional declaration of war—is of course lost.

The Department also argues that the threat of injury in this case is not immediate because there is only a "possibility" that the President will initiate war against Iraq, and additionally, that there is no way of knowing before the occurrence of such a possibility whether he would seek a declaration of war from Congress.

---

**15.**  *See, e.g., Barnes v. Kline,* 759 F.2d 21 (D.C. Cir.1984), *vacated as moot sub nom., Burke v. Barnes,* 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987); *Crockett v. Reagan,* 720 F.2d 1355 (D.C.Cir.1983); *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir.1983); *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.1981); *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir. 1974).

That argument, too, must fail, for although it is not entirely fixed what actions the Executive will take towards Iraq and what procedures he will follow with regard to his consultations with Congress,[16] it is clearly more than "unadorned speculation," *Pennell v. San Jose,* 485 U.S. 1, 8, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (*quoting Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976), that the President will go to war by initiating hostilities against Iraq without first obtaining a declaration of war from Congress.

With close to 400,000 United States troops stationed in Saudi Arabia, with all troop rotation and leave provisions suspended, and with the President having acted vigorously on his own as well as through the Secretary of State to obtain from the United Nations Security Council a resolution authorizing the use of all available means to remove Iraqi forces from Kuwait, including the use of force,[17] it is disingenuous for the Department to characterize plaintiffs' allegations as to the imminence of the threat of offensive military action for standing purposes as "remote and conjectural," Motion to Dismiss at 13, for standing purposes. *But see* Part V–B, *infra.* For these reasons, the Court concludes that the plaintiffs have adequately alleged a threat of injury in fact necessary to support standing.

### IV Remedial Discretion

■ Another issue raised by the Department which must be addressed briefly is the application to this case of the doctrine of "remedial" discretion [18] developed by the Court of Appeals for this Circuit.

In *Riegle v. Federal Open Market Committee,* 656 F.2d 873, 881 (D.C.Cir.1981), the court indicated that "where a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, this court should exercise its equitable discretion to dismiss the legislator's action." See also, *Melcher v. Federal Open Market Committee,* 836 F.2d 561, 563 (D.C. Cir.1987). The doctrine is said to evidence the "concern for the separation of powers" raised when a member of Congress asks the Court to rule on the constitutionality of a statute merely because he failed to persuade a majority of his colleagues of the wisdom of his views. *Barnes v. Kline,* 759 F.2d at 28 (D.C.Cir.1984), *vacated as moot sub nom., Burke v. Barnes,* 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987).

An analysis of the decisions which have dismissed actions on the basis of the remedial discretion doctrine shows that, virtually invariably,[19] the congressional plaintiffs were involved in intra-congressional battles, *see, e.g., Gregg v. Barrett,* 771 F.2d 539 (D.C.Cir.1985) (plaintiffs sought to challenge procedure by which the Congressional Record was published); *Moore v. United States House of Representatives, supra* (plaintiffs challenging the assignment of committee positions), or were seeking a ruling on the constitutionality of a statute. *See, e.g., Dornan v. United States Secretary of Defense,* 851 F.2d 450 (D.C.Cir.1988) (plaintiffs sought to challenge constitutionality of Boland Amendment); *Humphrey v. Baker,* 848 F.2d 211 (D.C.Cir.1988) (plaintiffs sought to challenge constitutionality of the Federal Salary Act of 1967); *Melcher, supra* (plaintiffs sought to challenge constitutionality of

---

**16.** These concerns touch also on the determination of ripeness addressed by the Court in Part V, *infra.*

**17.** *See* Plaintiffs' Memorandum in Support of Preliminary Injunction at 7–8; Plaintiffs' Exhibit 14 (President's News Conference on the Persian Gulf Crisis, November 8, 1990); Plaintiffs' Supplemental Exhibit 3 (United Nations Security Council Resolution) at 678 (1990).

**18.** The doctrine was first defined as "equitable" discretion, but in cases where plaintiffs seek

both declaratory and injunctive relief, the doctrine is termed "remedial" discretion. *See Vander Jagt v. O'Neill,* 699 F.2d 1166, 1175 n. 25 (D.C.Cir.1983).

**19.** In *Conyers v. Reagan,* 578 F.Supp. 324 (D.D. C.1984), *dismissed as moot,* 765 F.2d 1124 (D.C. Cir.1985), the trial court invoked the doctrine of remedial discretion to dismiss plaintiffs' challenge to the President's actions in the invasion of Grenada, but the decision was subsequently vacated as moot.

statute specifying composition of the Federal Open Market Committee); *Riegle, supra* (same). In the former situation, the congressional plaintiff has available to him the remedy of changing or enforcing internal rules of Congress, and in the latter, that of repealing or amending the allegedly unconstitutional statute.

■ The plaintiffs in this case do not have a remedy available from their fellow legislators. While action remains open to them which would make the issues involved more concrete, and hence make the matter ripe for review by the Court,[20] these actions would not remedy the threatened harm plaintiffs assert. A joint resolution counselling the President to refrain from attacking Iraq without a congressional declaration of war would not be likely to stop the President from initiating such military action if he is persuaded that the Constitution affirmatively gives him the power to act otherwise.

Plaintiffs in the instant case, therefore, cannot gain "substantial relief" by persuasion of their colleagues alone. The "remedies" of cutting off funding to the military or impeaching the President are not available to these plaintiffs either politically or practically. Additionally, these "remedies" would not afford the relief sought by the plaintiffs—which is the guarantee that they will have the opportunity to debate and vote on the wisdom of initiating a military attack against Iraq before the United States military becomes embroiled in belligerency with that nation.

## V  *Ripeness*

■ Although, as discussed above, the Court rejects several of defendant's objections to the maintenance of this lawsuit, and concludes that, in principle, an injunction may issue at the request of Members of Congress to prevent the conduct of a war which is about to be carried on without congressional authorization, it does not follow that these plaintiffs are entitled to relief at this juncture. For the plaintiffs are met with a significant obstacle to such relief: the doctrine of ripeness.

■ It has long been held that, as a matter of the deference that is due to the other branches of government, the Judiciary will undertake to render decisions that compel action by the President or the Congress only if the dispute before the Court is truly ripe, in that all the factors necessary for a decision are present then and there. The need for ripeness as a prerequisite to judicial action has particular weight in a case such as this. The principle that the courts shall be prudent in the exercise of their authority is never more compelling than when they are called upon to adjudicate on such sensitive issues as those trenching upon military and foreign affairs. Judicial restraint must, of course, be even further enhanced when the issue is one—as here—on which the other two branches may be deeply divided. Hence the necessity for determining at the outset whether the controversy is truly "ripe" for decision or whether, on the other hand, the Judiciary should abstain from rendering a decision on ripeness grounds.

In the context of this case, there are two aspects to ripeness, which the Court will now explore.

### A.  *Actions By the Congress*

No one knows the position of the Legislative Branch on the issue of war or peace[21] with Iraq; certainly no one, including this Court, is able to ascertain the congressional position on that issue on the basis of this lawsuit brought by fifty-three members of the House of Representatives and one member of the U.S. Senate. It would be both premature and presumptuous for the Court to render a decision on the issue of whether a declaration of war is required at this time or in the near future[22] when the Congress itself has provided no indication whether it deems such a declaration either

---

**20.** *See* discussion of ripeness, *infra*, Part V.

**21.** The "peace" position might more accurately be described as the view that the existing economic embargo of Iraq should be given more time to demonstrate its effectiveness or lack thereof.

**22.** *See* Part B, *infra*.

necessary, on the one hand, or imprudent, on the other.

For these reasons, this Court has elected to follow the course described by Justice Powell in his concurrence in *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). In that opinion, Justice Powell provided a test for ripeness in cases involving a confrontation between the legislative and executive branches that is helpful here.[23] In *Goldwater*, President Carter had informed Taiwan that the United States would terminate the mutual defense treaty between the two countries within one year. The President made this announcement without the ratification of the Congress, and members of Congress[24] brought suit claiming that, just as the Constitution required the Senate's ratification of the President's decision to enter into a treaty, so too, congressional ratification was necessary to terminate a treaty.

■ Justice Powell proposed that "a dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority." *Id.* at 997, 100 S.Ct. at 534. He further explained that in *Goldwater* there had been no such confrontation because there had as yet been no vote in the Senate as to what to do in the face of the President's action to terminate the treaty with Taiwan, and he went on to say that the

Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse. Otherwise we would encourage small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict ... It cannot be said that either the Senate or the House has rejected the President's claim. If the Congress chooses not to confront the President, it is not our task to do so.

444 U.S. at 997–98, 100 S.Ct. at 533–34.[25]

■ Justice Powell's reasoning commends itself to this Court. The consequences of judicial action in the instant case with the facts in their present posture may be drastic, but unnecessarily so. What if the Court issued the injunction requested by the plaintiffs, but it subsequently turned out that a majority of the members of the Legislative Branch were of the view (a) that the President is free as a legal or constitutional matter to proceed with his plans toward Iraq without a congressional declaration of war,[26] or (b) more broadly, that the majority of the members of this Branch, for whatever reason, are content to leave this diplomatically and politically delicate decision to the President?

It would hardly do to have the Court, in

---

**23.** That is so even though Justice Powell spoke only for himself. The Supreme Court, in a brief order, remanded the *Goldwater* case to the lower court with instructions to dismiss. Four different views were expressed by the various justices. However, several other courts have adopted Justice Powell's reasoning. *See, e.g., Lowry v. Reagan*, 676 F.Supp. 333, 339 (D.D.C. 1987), *aff'd*, No. 87–5426 (D.C.Cir. Oct. 17, 1988); *Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 210 (D.C.Cir.1985) (J.R.B. Ginsburg, concurring statement); *Crockett v. Reagan*, 558 F.Supp. 893, 899 (D.D.C.1982), *aff'd*, 720 F.2d 1355 (D.C.Cir.1983) (per curiam).

**24.** Plaintiffs were eight Senators, sixteen members of the House of Representatives, and one former Senator. *Goldwater v. Carter*, 481 F.Supp. 949, 950 (D.D.C.1979).

**25.** Plaintiffs here, and the American Civil Liberties Union filing as *amicus*, seek to distinguish *Goldwater* on the basis that in that case the

issue of Senate affirmation of treaty terminations is not expressly addressed by the Constitution, while in the instant case the power to declare war is expressly reserved to Congress in the Constitution. While this is an important difference between the cases, it has no bearing on the fact that before the Judiciary may review any case, and especially a case between the coordinate branches, there must be an actual conflict between the parties.

**26.** It might be that these legislators are content to follow some of the historical patterns, including those involving the hostilities in Vietnam and Korea where there was no declaration of war, or that they deem the consultations had in recent months and weeks between the Executive and congressional leaders to constitute adequate compliance with Article I, Section 8, Clause 11 of the Constitution.

effect, force a choice upon the Congress[27] by a blunt injunctive decision, called for by only about ten percent of its membership, to the effect that, unless the rest of the Congress votes in favor of a declaration of war, the President, and the several hundred thousand troops he has dispatched to the Saudi Arabian desert, must be immobilized. Similarly, the President is entitled to be protected from an injunctive order respecting a declaration of war when there is no evidence that this is what the Legislative Branch as such—as distinguished from a fraction thereof—regards as a necessary prerequisite to military moves in the Arabian desert.[28]

All these difficulties are avoided by a requirement that the plaintiffs in an action of this kind be or represent a majority of the Members of the Congress: the majority of the body that under the Constitution is the only one competent to declare war, and therefore also the one with the ability to seek an order from the courts to prevent anyone else, *i.e.*, the Executive, from in effect declaring war. In short, unless the Congress as a whole, or by a majority, is heard from, the controversy here cannot be deemed ripe; it is only if the majority of

the Congress seeks relief from an infringement on its constitutional war-declaration power that it may be entitled to receive it.[29]

### B. *Actions Taken By the Executive*

The second half of the ripeness issue involves the question whether the Executive Branch of government is so clearly committed to immediate military operations that may be equated with a "war" within the meaning of Article I, Section 8, Clause 11, of the Constitution that a judicial decision may properly be rendered regarding the application of that constitutional provision to the current situation.[30]

Plaintiffs assert that the matter is currently ripe for judicial action because the President himself has stated that the present troop build-up is to provide an adequate offensive military option in the area. His successful effort to secure passage of United Nations Resolution 678, which authorizes the use of "all available means" to oust Iraqi forces remaining in Kuwait after January 15, 1991, is said to be an additional fact pointing toward the Executive's intention to initiate military hostilities against Iraq in the near future.[31]

---

27. The plaintiffs argue that "Congress cannot, and should not, be able to read the War Powers Clause out of the Constitution by failure to act." Plaintiffs' Memorandum in Support of Preliminary Injunction at p. 34, n. 61. However, plaintiffs are not entitled to receive relief from action or non-action of their colleagues in Congress through a suit for an injunction against the President.

28. To be sure, Senate Majority Leader George Mitchell has been quoted as stating that "a planned military offensive, which is, by definition, an act of war, must receive the prior authorization of the Congress." Plaintiffs' Statement of Material Facts Not in Dispute at 3. However, the statement of one Senator, even one as distinguished as the Majority Leader, is not constitutionally the equivalent of the views of the Congress as an institution. Likewise, the non-binding resolution approved by the House Democratic Caucus stating that Congress give "affirmative approval" before military action is initiated against Iraq, *see The Washington Post*, December 5, 1990, A32, col. 4, is not the statement of Congress as a whole.

29. Of course, should Congress pass a resolution authorizing the President's proposed actions in the Persian Gulf area, one byproduct would be that the instant action would be mooted.

30. The Court rejects defendant's contention that the issue can never be ripe until hostilities have actually broken out. That argument would insulate the President from even the grossest violations of the War Clause of the Constitution, for a congressional vote after war has begun would likely to be without practical effect (as would also be the alternative suggestion that the Congress could always cut off funds for our fighting forces while they are engaged in military operations).

31. On December 3, one day before the hearing in the instant case, Secretary of Defense Dick Cheney testified to the Senate Armed Services Committee that "I do not believe the President requires any additional authorization from the Congress before committing U.S. forces to achieve our objectives in the Gulf." Plaintiffs' Supplemental Exhibit 2 ("Excerpts of Secretary of Defense Cheney's Senate Testimony, December 3, 1990) at 2. Secretary of State James Baker has asserted similar views on behalf of the Executive: "we do have a constitutionally different view ... on the constitutional question of the authority to commit forces." Plaintiffs' Exhibit 25 (Transcript, Hearing on U.S. Policy in the Persian Gulf, Senate Committee on Foreign Relations, October 17, 1990) at 54.

The Department of Justice, on the other hand, points to statements of the President that the troops already in Saudi Arabia are a peacekeeping force to prove that the President might not initiate more offensive military actions.[32] In addition, and more realistically, it is possible that the meetings set for later this month and next between President Bush and the Foreign Minister of Iraq, Tariq Aziz, in Washington, and Secretary of State James Baker and Saddam Hussein in Baghdad, may result in a diplomatic solution to the present situation,[33] and in any event under the U.N. Security Council resolution there will not be resort to force before January 15, 1991.

Given the facts currently available to this Court, it would seem that as of now the Executive Branch has not shown a commitment to a definitive course of action sufficient to support ripeness.[34] In any event, however, a final decision on that issue is not necessary at this time.

Should the congressional ripeness issue discussed in Part V–A above be resolved in favor of a finding of ripeness as a consequence of actions taken by the Congress as a whole, there will still be time enough to determine whether, in view of the conditions as they are found to exist at that time, the Executive is so clearly committed to early military operations amounting to "war" in the constitutional sense that the Court would be justified in concluding that the remainder of the test of ripeness has been met. And of course an injunction will be issued only if, on both of the aspects of the doctrine discussed above, the Court could find that the controversy is ripe for judicial decision. That situation does not, or at least not yet, prevail, and plaintiffs' request for a preliminary injunction will therefore not be granted.

For the reasons stated, it is this 13th day of December, 1990

ORDERED that plaintiffs' motion for preliminary injunction be and it is hereby denied.

---

**32.** Defendant's Exhibit 1 (Letter to the Speaker of the House and the President Pro Tempore of the Senate on the Deployment of United States Armed Forces to Saudi Arabia and the Middle East, August 9, 1990).

**33.** *See* Plaintiffs' Supplemental Exhibit 1 (Press Conference by the President, November 30, 1990) at 3.

**34.** Obviously, while plaintiffs cannot be expected to pinpoint precisely the time when the Executive will take action that is equivalent to war, constitutional ripeness demands that their submission be more definite and more immediate than it is now.