# The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them

The President has broad constitutional power to take military action in response to the terrorist attacks on the United States on September 11, 2001. Congress has acknowledged this inherent executive power in both the War Powers Resolution and the Joint Resolution passed by Congress on September 14, 2001.

The President has constitutional power not only to retaliate against any person, organization, or state suspected of involvement in terrorist attacks on the United States, but also against foreign states suspected of harboring or supporting such organizations.

The President may deploy military force preemptively against terrorist organizations or the states that harbor or support them, whether or not they can be linked to the specific terrorist incidents of September 11.

September 25, 2001

MEMORANDUM OPINION FOR THE DEPUTY COUNSEL TO THE PRESIDENT[*]

You have asked for our opinion as to the scope of the President's authority to take military action in response to the terrorist attacks on the United States on September 11, 2001. We conclude that the President has broad constitutional power to use military force. Congress has acknowledged this inherent executive power in both the War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555 (1973), *codified at* 50 U.S.C. §§ 1541-1548 (the "WPR"), and in the Joint Resolution passed by Congress on September 14, 2001, Pub. L. No. 107-40, 115 Stat. 224 (2001). Further, the President has the constitutional power not only to retaliate against any person, organization, or state suspected of involvement in terrorist attacks on the United States, but also against foreign states suspected of harboring or supporting such organizations. Finally, the President may deploy military force preemptively against terrorist organizations or the states that harbor or support them, whether or not they can be linked to the specific terrorist incidents of September 11.

Our analysis falls into four parts. First, we examine the Constitution's text and structure. We conclude that the Constitution vests the President with the plenary authority, as Commander in Chief and the sole organ of the Nation in its foreign relations, to use military force abroad—especially in response to grave national emergencies created by sudden, unforeseen attacks on the people and territory of the United States. Second, we confirm that conclusion by reviewing the executive and judicial statements and decisions interpreting the Constitution and the

_____

[*] Editor's Note: For the book edition of this memorandum opinion, some of the internet citations have been updated or replaced with citations of equivalent printed authorities.

President's powers under it. Third, we analyze the relevant practice of the United States, including recent history, that supports the view that the President has the authority to deploy military force in response to emergency conditions such as those created by the September 11, 2001 terrorist attacks. Finally, we discuss congressional enactments that, in our view, acknowledge the President's plenary authority to use force to respond to the terrorist attack on the United States.

Our review establishes that all three branches of the federal government—Congress, the Executive, and the Judiciary—agree that the President has broad authority to use military force abroad, including the ability to deter future attacks.

## I.

The President's constitutional power to defend the United States and the lives of its people must be understood in light of the Founders' express intention to create a federal government "cloathed with all the powers requisite to [the] complete execution of its trust." *The Federalist* No. 23, at 122 (Alexander Hamilton) (Charles R. Kesler ed., 1999). Foremost among the objectives committed to that trust by the Constitution is the security of the Nation.[1] As Hamilton explained in arguing for the Constitution's adoption, because "the circumstances which may affect the public safety are [not] reducible within certain determinate limits, . . . it must be admitted, as a necessary consequence that there can be no limitation of that authority which is to provide for the defense and protection of the community in any matter essential to its efficiency." *Id.*[2]

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981)

---

[1] "As Lincoln aptly said, '[is] it possible to lose the nation and yet preserve the Constitution?'" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 662 (1952) (Clark, J., concurring in judgment).

[2] *See also The Federalist* No. 34, at 207 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (federal government is to possess "an indefinite power of providing for emergencies as they might arise"); *id*. No. 41, at 256 (James Madison) ("Security against foreign danger is one of the primitive objects of civil society. . . . The powers requisite for attaining it must be effectually confided to the federal councils."). Many Supreme Court opinions echo Hamilton's argument that the Constitution presupposes the indefinite and unpredictable nature of the "the circumstances which may affect the public safety," and that the federal government's powers are correspondingly broad. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 662 (1981) (noting that the President "exercis[es] the executive authority in a world that presents each day some new challenge with which he must deal"); *Hamilton v. Regents*, 293 U.S. 245, 264 (1934) (federal government's war powers are "well-nigh limitless" in extent); *Stewart v. Kahn*, 78 U.S. (11 Wall.) 493, 506 (1870) ("The measures to be taken in carrying on war . . . are not defined [in the Constitution]. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution."); *Miller v. United States*, 78 U.S. (11 Wall.) 268, 305 (1870) ("The Constitution confers upon Congress expressly power to declare war, grant letters of marque and reprisal, and make rules respecting captures on land and water. Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted.").

(citation omitted). Within the limits that the Constitution itself imposes, the scope and distribution of the powers to protect national security must be construed to authorize the most efficacious defense of the Nation and its interests in accordance "with the realistic purposes of the entire instrument." *Lichter v. United States*, 334 U.S. 742, 782 (1948). Nor is the authority to protect national security limited to actions necessary for "victories in the field." *Application of Yamashita*, 327 U.S. 1, 12 (1946). The authority over national security "carries with it the inherent power to guard against the immediate renewal of the conflict." *Id*.

We now turn to the more precise question of the President's inherent constitutional powers to use military force.

*Constitutional Text*. The text, structure and history of the Constitution establish that the Founders entrusted the President with the primary responsibility, and therefore the power, to use military force in situations of emergency. Article II, Section 2 states that the "President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1. He is further vested with all of "the executive Power" and the duty to execute the laws. U.S. Const. art. II, § 1. These powers give the President broad constitutional authority to use military force in response to threats to the national security and foreign policy of the United States.[3] During the period leading up to the Constitution's ratification, the power to initiate hostilities and to control the escalation of conflict had been long understood to rest in the hands of the Executive Branch.[4]

By their terms, these provisions vest full control of the military forces of the United States in the President. The power of the President is at its zenith under the Constitution when the President is directing military operations of the armed forces, because the power of Commander in Chief is assigned solely to the President. It has long been the view of this Office that the Commander-in-Chief Clause is a substantive grant of authority to the President and that the scope of the President's authority to commit the armed forces to combat is very broad. *See, e.g.*, Memorandum for Charles W. Colson, Special Counsel to the President, from

---

[3] *See Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (President has authority to deploy United States armed forces "abroad or to any particular region"); *Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual . . . ."); *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and concurring in judgment) (The "inherent powers" of the Commander in Chief "are clearly extensive."); *Maul v. United States*, 274 U.S. 501, 515-16 (1927) (Brandeis & Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any waters in order to perform any duty of the service"); *Massachusetts v. Laird*, 451 F.2d 26, 32 (1st Cir. 1971) (the President has "power as Commander-in-Chief to station forces abroad"); *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6 (1992).

[4] *See* John C. Yoo, *The Continuation of Politics by Other Means: The Original Understanding of War Powers*, 84 Cal. L. Rev. 167, 196-241 (1996).

William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* (May 22, 1970) (the "Rehnquist Memo"). The President's complete discretion in exercising the Commander-in-Chief power has also been recognized by the courts. In the *Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862), for example, the Court explained that, whether the President "in fulfilling his duties as Commander in-Chief" had met with a situation justifying treating the southern States as belligerents and instituting a blockade, was a question "to be decided *by him*" and which the Court could not question, but must leave to "the political department of the Government to which this power was entrusted."[5]

Some commentators have read the constitutional text differently. They argue that the vesting of the power to declare war gives Congress the sole authority to decide whether to make war.[6] This view misreads the constitutional text and

---

[5] *See Prize Cases*, 67 U.S. at 670 ("He must determine what degree of force the crisis demands."); *see also Eisentrager*, 339 U.S. at 789 ("Certainly it is not the function of the Judiciary to entertain private litigation—even by a citizen—which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region."); *Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1561 (D.C. Cir. 1984) (Scalia, J., dissenting), *vacated by* 471 U.S. 1113 (1985); *Ex parte Vallandigham*, 28 F. Cas. 874, 922 (C.C.S.D. Ohio 1863) (No. 16,816) (in acting "under this power where there is no express legislative declaration, the president is guided solely by his own judgment and discretion"); *Hefleblower v. United States*, 21 Ct. Cl. 228, 238 (Ct. Cl. 1886) ("The responsibility of declaring what portions of the country were in insurrection and of declaring when the insurrection came to an end was accorded to the President; when he declared a portion of the country to be in insurrection the judiciary cannot try the issue and find the territory national; conversely, when the President declared the insurrection at an end in any portion of the country, the judiciary cannot try the issue and find the territory hostile."); *cf. United States v. Chemical Found., Inc.*, 272 U.S. 1, 12 (1926) ("It was peculiarly within the province of the Commander-in-Chief to know the facts and to determine what disposition should be made of enemy properties in order effectively to carry on the war.").

[6] *See, e.g.*, Louis Fisher, *Presidential War Power* 185-206 (1995); John Hart Ely, *War and Responsibility: Constitutional Lessons of Vietnam and Its Aftermath* 3-5 (1993); Michael J. Glennon, *Constitutional Diplomacy* 80-84 (1990); Louis Henkin, *Constitutionalism, Democracy, and Foreign Affairs* 109 (1990); Harold Hongju Koh, *The National Security Constitution: Sharing Power After the Iran-Contra Affair* 158-61 (1990); Francis D. Wormuth & Edwin B. Firmage, *To Chain the Dog of War: The War Power of Congress in History and Law* (2d ed. 1989).

Other scholars, however, have argued that the President has the constitutional authority to initiate military hostilities without prior congressional authorization. *See, e.g.*, Edward S. Corwin, *The President: Office and Powers 1787-1984* (5th ed. 1984); Philip Bobbitt, *War Powers: An Essay on John Hart Ely's "War and Responsibility: Constitutional Lessons of Vietnam and Its Aftermath,"* 92 Mich. L. Rev. 1364 (1994); Robert H. Bork, *Erosion of the President's Power in Foreign Affairs*, 68 Wash. U.L.Q. 693 (1990); Henry P. Monaghan, *Presidential War-Making*, 50 B.U.L. Rev. 19 (1970); W. Michael Reisman, *Some Lessons from Iraq: International Law and Democratic Politics*, 16 Yale J. Int'l L. 203 (1991); Eugene V. Rostow, *"Once More unto the Breach": The War Powers Resolution*

misunderstands the nature of a declaration of war. Declaring war is not tantamount to making war—indeed, the Constitutional Convention specifically amended the working draft of the Constitution that had given Congress the power to make war. An earlier draft of the Constitution had given to Congress the power to "make" war. When it took up this clause on August 17, 1787, the Convention voted to change the clause from "make" to "declare." 2 *The Records of the Federal Convention of 1787*, at 318-19 (Max Farrand ed., rev. ed. 1966). A supporter of the change argued that it would "leav[e] to the Executive the power to repel sudden attacks." *Id*. at 318. Further, other elements of the Constitution describe "engaging" in war, which demonstrates that the Framers understood making and engaging in war to be broader than simply "declaring" war. *See* U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."). A state constitution at the time of the ratification included provisions that prohibited the governor from "making" war without legislative approval, S.C. Const. art. XXVI (1776), *reprinted in* 6 *The Federal and State Constitutions* 3247 (Francis Newton Thorpe ed., 1909).[7] If the Framers had wanted to require congressional consent before the initiation of military hostilities, they knew how to write such provisions.

Finally, the Framing generation well understood that declarations of war were obsolete. Not all forms of hostilities rose to the level of a declared war: during the seventeenth and eighteenth centuries, Great Britain and colonial America waged numerous conflicts against other states without an official declaration of war.[8] As Alexander Hamilton observed during the ratification, "the ceremony of a formal denunciation of war has of late fallen into disuse." *The Federalist* No. 25, at 165 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Instead of serving as an authorization to begin hostilities, a declaration of war was only necessary to "perfect" a conflict under international law. A declaration served to fully transform the international legal relationship between two states from one of peace to one of war. *See* 1 William Blackstone, *Commentaries* *249-50. Given this context,

---

*Revisited*, 21 Val. U. L. Rev. 1 (1986); John C. Yoo, *Kosovo, War Powers, and the Multilateral Future*, 148 U. Pa. L. Rev. 1673 (2000); Yoo, 84 Cal. L. Rev. 167.

[7] A subsequent version made clear "that the governor and commander-in-chief shall have no power to commence war, or conclude peace, or enter into any final treaty" without legislative approval. S.C. Const. art. XXXIII (1778), *reprinted in* 6 *The Federal and State Constitutions* 3255 (Francis Newton Thorpe ed., 1909).

[8] Of the eight major wars fought by Great Britain prior to the ratification of the Constitution, war was declared only once before the start of hostilities. *See* Yoo, 84 Cal. L. Rev. at 214-15. *See also* W. Taylor Reveley, III, *War Powers of the President and Congress: Who Holds the Arrows and Olive Branch?* 55 (1981) ("[U]ndeclared war was the norm in eighteenth-century European practice, a reality brought home to Americans when Britain's Seven Years' War with France began on this continent."); William Michael Treanor, *Fame, The Founding, and The Power to Declare War*, 82 Cornell L. Rev. 695, 709 (1997).

it is clear that Congress's power to declare war does not constrain the President's independent and plenary constitutional authority over the use of military force.

*Constitutional Structure*. Our reading of the text is reinforced by analysis of the constitutional structure. First, it is clear that the Constitution secures all federal executive power in the President to ensure a unity in purpose and energy in action. "Decision, activity, secrecy, and dispatch will generally characterize the proceedings of one man in a much more eminent degree than the proceedings of any greater number." *The Federalist* No. 70, at 424 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The centralization of authority in the President alone is particularly crucial in matters of national defense, war, and foreign policy, where a unitary executive can evaluate threats, consider policy choices, and mobilize national resources with a speed and energy that is far superior to any other branch. As Hamilton noted, "Energy in the executive is a leading character in the definition of good government. It is essential to the protection of the community against foreign attacks." *Id*. at 423. This is no less true in war. "Of all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand." *Id*. No. 74, at 447 (Alexander Hamilton).[9]

Second, the Constitution makes clear that the process used for conducting military hostilities is different from other government decisionmaking. In the area of domestic legislation, the Constitution creates a detailed, finely wrought procedure in which Congress plays the central role. In foreign affairs, however, the Constitution does not establish a mandatory, detailed, Congress-driven procedure for taking action. Rather, the Constitution vests the two branches with different powers—the President as Commander in Chief, Congress with control over funding and declaring war—without requiring that they follow a specific process in making war. By establishing this framework, the Framers expected that the process for warmaking would be far more flexible, and capable of quicker, more decisive action, than the legislative process. Thus, the President may use his Commander-in-Chief and executive powers to use military force to protect the Nation, subject to congressional appropriations and control over domestic legislation.

---

[9] James Iredell (later an Associate Justice of the Supreme Court) argued in the North Carolina Ratifying Convention that "[f]rom the nature of the thing, the command of armies ought to be delegated to one person only. The secrecy, despatch, and decision, which are necessary in military operations, can only be expected from one person." Debate in the North Carolina Ratifying Convention, *in* 4 Jonathan Elliott, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, at 107 (2d ed. 1987). *See also* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1485 (1833) ("Story") (in military matters, "[u]nity of plan, promptitude, activity, and decision, are indispensable to success; and these can scarcely exist, except when a single magistrate is entrusted exclusively with the power").

Third, the constitutional structure requires that any ambiguities in the allocation of a power that is executive in nature—such as the power to conduct military hostilities—must be resolved in favor of the Executive Branch. Article II, Section 1 provides that "[t]he executive Power shall be vested in a President of the United States." U.S. Const. art. II, § 1. By contrast, Article I's Vesting Clause gives Congress only the powers "herein granted." *Id*. art. I, § 1. This difference in language indicates that Congress's legislative powers are limited to the list enumerated in Article I, Section 8, while the President's powers include inherent executive powers that are unenumerated in the Constitution. To be sure, Article II lists specifically enumerated powers in addition to the Vesting Clause, and some have argued that this limits the "executive Power" granted in the Vesting Clause to the powers on that list. But the purpose of the enumeration of executive powers in Article II was not to define and cabin the grant in the Vesting Clause. Rather, the Framers unbundled some plenary powers that had traditionally been regarded as "executive," assigning elements of those powers to Congress in Article I, while expressly reserving other elements as enumerated executive powers in Article II. So, for example, the King's traditional power to declare war was given to Congress under Article I, while the Commander-in-Chief authority was expressly reserved to the President in Article II. Further, the Framers altered other plenary powers of the King, such as treaties and appointments, assigning the Senate a share in them in Article II itself.[10] Thus, the enumeration in Article II marks the points at which several traditional executive powers were diluted or reallocated. Any other unenumerated executive powers, however, were conveyed to the President by the Vesting Clause.

There can be little doubt that the decision to deploy military force is "executive" in nature, and was traditionally so regarded. It calls for action and energy in execution, rather than the deliberate formulation of rules to govern the conduct of private individuals. Moreover, the Framers understood it to be an attribute of the executive. "The direction of war implies the direction of the common strength," wrote Alexander Hamilton, "and the power of directing and employing the common strength forms a usual and essential part in the definition of the executive authority." *The Federalist* No. 74, at 447 (Alexander Hamilton) (Clinton Rossiter ed., 1961). As a result, to the extent that the constitutional text does not explicitly allocate the power to initiate military hostilities to a particular branch, the Vesting Clause provides that it remain among the President's unenumerated powers.

---

[10] Thus, Article II's enumeration of the Treaty and Appointments Clauses only dilutes the unitary nature of the Executive Branch in regard to the exercise of those powers, rather than transforming them into quasi-legislative functions. *See Constitutionality of Proposed Conditions to Senate Consent to the Interim Convention on Conservation of North Pacific Fur Seals*, 10 Op. O.L.C. 12, 17 (1986) ("Nothing in the text of the Constitution or the deliberations of the Framers suggests that the Senate's advice and consent role in the treaty-making process was intended to alter the fundamental constitutional balance between legislative authority and executive authority.").

Fourth, depriving the President of the power to decide when to use military force would disrupt the basic constitutional framework of foreign relations. From the very beginnings of the Republic, the vesting of the executive, Commander-in-Chief, and treaty powers in the Executive Branch has been understood to grant the President plenary control over the conduct of foreign relations. As Secretary of State Thomas Jefferson observed during the first Washington Administration, "[t]he constitution has divided the powers of government into three branches [and] has declared that the executive powers shall be vested in the president, submitting only special articles of it to a negative by the senate." Thomas Jefferson, Opinion on the Powers of the Senate (1790), *reprinted in* 5 *The Writings of Thomas Jefferson* at 161 (Paul L. Ford ed., 1895). Due to this structure, Jefferson continued, "[t]he transaction of business with foreign nations is executive altogether; it belongs, then, to the head of that department, except as to such portions of it as are specially submitted to the senate. Exceptions are to be construed strictly." *Id*. In defending President Washington's authority to issue the Neutrality Proclamation, Alexander Hamilton came to the same interpretation of the President's foreign affairs powers. According to Hamilton, Article II "ought . . . to be considered as intended . . . to specify and regulate the principal articles implied in the definition of Executive Power; leaving the rest to flow from the general grant of that power." Alexander Hamilton, Pacificus No. 1 (1793), *reprinted in* 15 *The Papers of Alexander Hamilton* at 33, 39 (Harold C. Syrett et al. eds., 1969). As future Chief Justice John Marshall famously declared a few years later, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations . . . . The [executive] department . . . is entrusted with the whole foreign intercourse of the nation . . . ." 10 Annals of Cong. 613-14 (1800). Given the agreement of Jefferson, Hamilton, and Marshall, it has not been difficult for the Executive Branch consistently to assert the President's plenary authority in foreign affairs ever since.

On the relatively few occasions where it has addressed foreign affairs, the Supreme Court has agreed with the Executive Branch's consistent interpretation. Conducting foreign affairs and protecting the national security are, as the Supreme Court has observed, "'central' Presidential domains." *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982). The President's constitutional primacy flows from both his unique position in the constitutional structure, and from the specific grants of authority in Article II that make the President both the Chief Executive of the Nation and the Commander in Chief. *See Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982). Due to the President's constitutionally superior position, the Supreme Court has consistently "recognized 'the generally accepted view that foreign policy [is] the province and responsibility of the Executive.'" *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. at 293-94). "The Founders in their wisdom made [the President] not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs," possessing "vast

powers in relation to the outside world." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948). This foreign affairs power is exclusive: it is "the very delicate, plenary and exclusive power of the President as sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

Conducting military hostilities is a central tool for the exercise of the President's plenary control over the conduct of foreign policy. There can be no doubt that the use of force protects the Nation's security and helps it achieve its foreign policy goals. Construing the Constitution to grant such power to another branch could prevent the President from exercising his core constitutional responsibilities in foreign affairs. Even in the cases in which the Supreme Court has limited executive authority, it has also emphasized that we should not construe legislative prerogatives to prevent the Executive Branch "from accomplishing its constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).

## II.

*Executive Branch Construction and Practice.* The position we take here has long represented the view of the Executive Branch and of the Department of Justice. Attorney General (later Justice) Robert Jackson formulated the classic statement of the Executive Branch's understanding of the President's military powers in 1941:

> Article II, section 2, of the Constitution provides that the President "shall be Commander in Chief of the Army and Navy of the United States." By virtue of this constitutional office he has supreme command over the land and naval forces of the country and may order them to perform such military duties as, in his opinion, are necessary or appropriate for the defense of the United States. These powers exist in time of peace as well as in time of war.

> . . . .

> Thus the President's responsibility as Commander in Chief embraces the authority to command and direct the armed forces in their immediate movements and operations designed to protect the security and effectuate the defense of the United States. . . . [T]his authority undoubtedly includes the power to dispose of troops and equipment in such manner and on such duties as best to promote the safety of the country.

*Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61-62 (1941).[11] Other Attorneys General have defended similar accounts of the President's constitutional powers and duties, particularly in times of unforeseen emergencies.

Attorney General William P. Barr, quoting the opinion of Attorney General Jackson just cited, advised the President in 1992 that "[y]ou have authority to commit troops overseas without specific prior Congressional approval 'on missions of good will or rescue, or for the purpose of protecting American lives or property or American interests.'" *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 6 (1992) (citation omitted).

Attorney General (later Justice) Frank Murphy, though declining to define precisely the scope of the President's independent authority to act in emergencies or states of war, stated that:

> the Executive has powers not enumerated in the statutes—powers derived not from statutory grants but from the Constitution. It is universally recognized that the constitutional duties of the Executive carry with them the constitutional powers necessary for their proper performance. These constitutional powers have never been specifically defined, and in fact cannot be, since their extent and limitations are largely dependent upon conditions and circumstances. . . . The right to take specific action might not exist under one state of facts, while under another it might be the absolute duty of the Executive to take such action.

*Request of the Senate for an Opinion as to the Powers of the President "In Emergency or State of War,"* 39 Op. Att'y Gen. 343, 347-48 (1939).

Attorney General Thomas Gregory opined in 1914 that "[i]n the preservation of the safety and integrity of the United States and the protection of its responsibilities and obligations as a sovereignty, [the President's] powers are broad." *Censorship of Radio Stations*, 30 Op. Att'y Gen. 291, 292 (1914).

Finally, in 1898, Acting Attorney General John K. Richards wrote:

> The preservation of our territorial integrity and the protection of our foreign interests is intrusted, in the first instance, to the President. . . .
> In the protection of these fundamental rights, which are based upon the Constitution and grow out of the jurisdiction of this nation over

---

[11] At the time Attorney General Jackson delivered his opinion, the United States was a neutral, and thus his conclusions about the President's powers did not rest on any special considerations that might apply in time of war. Although he stated that he was "inclined to the opinion" that a statute (the Lend-Lease Act) authorized the decision under review, Jackson expressly based his conclusion on the President's constitutional authority. 40 Op. Att'y Gen. at 61.

its own territory and its international rights and obligations as a distinct sovereignty, the President is not limited to the enforcement of specific acts of Congress. [The President] must preserve, protect, and defend those fundamental rights which flow from the Constitution itself and belong to the sovereignty it created.

*Foreign Cables*, 22 Op. Att'y Gen. 13, 25-26 (1898). Acting Attorney General Richards cited, among other judicial decisions, *Cunningham v. Neagle*, 135 U.S. 1, 64 (1890), in which the Supreme Court stated that the President's power to enforce the laws of the United States "include[s] the rights, duties and obligations growing out of the constitution itself, our international relations, and all the protection implied by the nature of the government under the constitution."

*Opinions of the Office of Legal Counsel.* Our Office has taken the position in recent Administrations, including those of Presidents Clinton, Bush, Reagan, Carter, and Nixon, that the President may unilaterally deploy military force in order to protect the national security and interests of the United States.

In 1995, we opined that the President, "acting without specific statutory authorization, lawfully may introduce United States ground troops into Bosnia and Herzegovina . . . to help the North Atlantic Treaty Organization . . . ensure compliance with the recently negotiated peace agreement." *Proposed Deployment of United States Armed Forces in Bosnia and Herzegovina*, 19 Op. O.L.C. 327, 327 (1995) (the "Bosnia Opinion"). We interpreted the WPR to "lend[] support to the . . . conclusion that the President has authority, without specific statutory authorization, to introduce troops into hostilities in a substantial range of circumstances." *Id.* at 335.

In *Deployment of United States Armed Forces into Haiti*, 18 Op. O.L.C. 173 (1994), we advised that the President had the authority unilaterally to deploy some 20,000 troops into Haiti. We relied in part on the structure of the WPR, which we argued "makes sense only if the President may introduce troops into hostilities or potential hostilities without prior authorization by the Congress." *Id.* at 175-76. We further argued that "in establishing and funding a military force that is capable of being projected anywhere around the globe, Congress has given the President, as Commander in Chief, considerable discretion in deciding how that force is to be deployed." *Id.* at 177. We also cited and relied upon the past practice of the Executive Branch in undertaking unilateral military interventions:

> In 1940, after the fall of Denmark to Germany, President Franklin Roosevelt ordered United States troops to occupy Greenland, a Danish possession in the North Atlantic of vital strategic interest to the United States. . . . Congress was not consulted or even directly informed. . . . Later, in 1941, the President ordered United States troops to occupy Iceland, an independent nation, pursuant to an

agreement between himself and the Prime Minister of Iceland. The President relied upon his authority as Commander in Chief, and notified Congress only after the event. . . . More recently, in 1989, at the request of President Corazon Aquino, President Bush authorized military assistance to the Philippine government to suppress a coup attempt.

*Id*. at 178.

In *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6 (1992), our Office advised that the President had the constitutional authority to deploy United States Armed Forces into Somalia in order to assist the United Nations in ensuring the safe delivery of relief to distressed areas of that country. We stated that "the President's role under our Constitution as Commander in Chief and Chief Executive vests him with the constitutional authority to order United States troops abroad to further national interests such as protecting the lives of Americans overseas." *Id*. at 8. Citing past practice (further discussed below), we pointed out that

> [f]rom the instructions of President Jefferson's Administration to Commodore Richard Dale in 1801 to "chastise" Algiers and Tripoli if they continued to attack American shipping, to the present, Presidents have taken military initiatives abroad on the basis of their constitutional authority. . . . Against the background of this repeated past practice under many Presidents, this Department and this Office have concluded that the President has the power to commit United States troops abroad for the purpose of protecting important national interests.

*Id*. at 9 (citations omitted).

In *Overview of the War Powers Resolution*, 8 Op. O.L.C. 271, 275 (1984), we noted that "[t]he President's authority to deploy armed forces has been exercised in a broad range of circumstances [in] our history."

In *Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 187 (1980), we stated that

> [o]ur history is replete with instances of presidential uses of military force abroad in the absence of prior congressional approval. This pattern of presidential initiative and congressional acquiescence may be said to reflect the implicit advantage held by the executive over the legislature under our constitutional scheme in situations calling for immediate action. Thus, constitutional practice over two centuries, supported by the nature of the functions exercised and by the

few legal benchmarks that exist, evidences the existence of broad constitutional power.

In light of that understanding, we advised that the President had independent constitutional authority unilaterally to order "(1) deployment abroad at some risk of engagement—for example, the current presence of the fleet in the Persian Gulf region; (2) a military expedition to rescue the hostages or to retaliate against Iran if the hostages are harmed; (3) an attempt to repel an assault that threatens our vital interests in that region." *Id*. at 185-86. *See also Presidential Powers Relating to the Situation in Iran*, 4A Op. O.L.C. 115, 121 (1979) ("It is well established that the President has the constitutional power as Chief Executive and Commander-in-Chief to protect the lives and property of Americans abroad. This understanding is reflected in judicial decisions . . . and recurring historic practice which goes back to the time of Jefferson.").

Finally, in the Rehnquist Memo, we concluded that the President as Commander in Chief had the authority "to commit military forces of the United States to armed conflict . . . to protect the lives of American troops in the field." *Id*. at 8.

*Judicial Construction*. Judicial decisions since the beginning of the Republic confirm the President's constitutional power and duty to repel military action against the United States through the use of force, and to take measures to deter the recurrence of an attack. As Justice Joseph Story said long ago, "[i]t may be fit and proper for the government, in the exercise of the high discretion confided to the executive, for great public purposes, to act on a sudden emergency, or to prevent an irreparable mischief, by summary measures, which are not found in the text of the laws." *The Apollon*, 22 U.S. (9 Wheat.) 362, 366-67 (1824). The Constitution entrusts the "power [to] the executive branch of the government to preserve order and insure the public safety in times of emergency, when other branches of the government are unable to function, or their functioning would itself threaten the public safety." *Duncan v. Kahanamoku*, 327 U.S. 304, 335 (1946) (Stone, C.J., concurring).

If the President is confronted with an unforeseen attack on the territory and people of the United States, or other immediate, dangerous threat to American interests and security, the courts have affirmed that it is his constitutional responsibility to respond to that threat with whatever means are necessary, including the use of military force abroad. *See, e.g.*, *Prize Cases*, 67 U.S. at 635 ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority."); *Kahanamoku*, 327 U.S. at 336 (Stone, C.J., concurring) ("Executive has broad discretion in determining when the public emergency is such as to give rise to the necessity" for emergency measures); *United States v. Smith*, 27 F. Cas. 1192, 1230 (C.C.D.N.Y. 1806) (No. 16,342) (Paterson, Circuit Justice) (regardless of statutory authorization, it is "the duty . . . of the executive magistrate . . . to

repel an invading foe");[12] *Mitchell v. Laird*, 488 F.2d 611, 613 (D.C. Cir. 1973) ("there are some types of war which without Congressional approval, the President may begin to wage: for example, he may respond immediately without such approval to a belligerent attack");[13] *see also Campbell v. Clinton*, 203 F.3d 19, 27 (D.C. Cir.) (Silberman, J. concurring) ("[T]he President has independent authority to repel aggressive acts by third parties even without specific statutory authorization."), *cert. denied*, 531 U.S. 815 (2000); *id.* at 40 (Tatel, J., concurring) ("[T]he President, as Commander in Chief, possesses emergency authority to use military force to defend the nation from attack without obtaining prior congressional approval."); Story, *supra* note 9, § 1485 ("[t]he command and application of the public force . . . to maintain peace, and to resist foreign invasion" are executive powers).

## III.

The historical practice of all three branches confirms the lessons of the constitutional text and structure. The normative role of historical practice in constitutional law, and especially with regard to separation of powers, is well settled.[14] Both the Supreme Court and the political branches have often recognized that governmental practice plays a highly significant role in establishing the contours of the constitutional separation of powers: "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on 'executive Power' vested in the President by § 1 of Art. II." *Youngstown Sheet & Tube Co.*, 343 U.S. at 610-11 (Frankfurter, J., concurring). Indeed, as the Court has observed, the role of practice in fixing the meaning of the separation of powers is implicit in the Constitution itself: "'the Constitution . . . contemplates that practice will integrate the dispersed powers into a workable government.'" *Mistretta v. United States*, 488 U.S. 361,

---

[12] Justice Paterson went on to remark that in those circumstances "it would I apprehend, be not only lawful for the president to resist such invasion, but also to carry hostilities into the enemy's own country." 27 F. Cas. at 1230.

[13] The court further observed that "in a grave emergency [the President] may, without Congressional approval, take the initiative to wage war. . . . In such unusual situations necessity confers the requisite authority upon the President. Any other construction of the Constitution would make it self-destructive." 488 F.2d at 613-14. *Accord Massachusetts v. Laird*, 451 F.2d at 31 ("[t]he executive may without Congressional participation repel attack").

[14] As the Supreme Court has noted, "the decisions of the Court in th[e] area [of foreign affairs] have been rare, episodic, and afford little precedential value for subsequent cases." *Dames & Moore*, 453 U.S. at 661. In particular, the difficulty the courts experience in addressing "the broad range of vitally important day-to-day questions regularly decided by Congress or the Executive" with respect to foreign affairs and national security makes the judiciary "acutely aware of the necessity to rest [judicial] decision[s] on the narrowest possible ground capable of deciding the case." *Id.* at 660-61. Historical practice and the ongoing tradition of Executive Branch constitutional interpretation therefore play an especially important role in this area.

381 (1989) (citation omitted). In addition, governmental practice enjoys significant weight in constitutional analysis for practical reasons, on "the basis of a wise and quieting rule that, in determining . . . the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation." *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915).

The role of practice is heightened in dealing with issues affecting foreign affairs and national security, where "the Court has been particularly willing to rely on the practical statesmanship of the political branches when considering constitutional questions." *Whether Uruguay Round Agreements Required Ratification as a Treaty*, 18 Op. O.L.C. 232, 234 (1994). "The persistence of these controversies (which trace back to the eighteenth century), and the nearly complete absence of judicial decisions resolving them, underscore the necessity of relying on congressional precedent to *interpret* the relevant constitutional provisions." *Id.* at 236. Accordingly, we give considerable weight to the practice of the political branches in trying to determine the constitutional allocation of warmaking powers between them.

The historical record demonstrates that the power to initiate military hostilities, particularly in response to the threat of an armed attack, rests exclusively with the President. As the Supreme Court has observed, "[t]he United States frequently employs Armed Forces outside this country—over 200 times in our history—for the protection of American citizens or national security." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990). On at least 125 such occasions, the President acted without prior express authorization from Congress. *See* Bosnia Opinion, 19 Op. O.L.C. at 331. Such deployments, based on the President's constitutional authority alone, have occurred since the Administration of George Washington. *See* David P. Currie, *The Constitution in Congress: Substantive Issues in the First Congress, 1789-1791*, 61 U. Chi. L. Rev. 775, 816 (1994) ("[B]oth Secretary [of War] Knox and [President] Washington himself seemed to think that this [Commander-in-Chief] authority extended to offensive operations taken in retaliation for Indian atrocities.") (quoted in Bosnia Opinion, 19 Op. O.L.C. at 331 n.4). Perhaps the most significant deployment without specific statutory authorization took place at the time of the Korean War, when President Truman, without prior authorization from Congress, deployed United States troops in a war that lasted for over three years and caused over 142,000 American casualties. *See* Bosnia Opinion, 19 Op. O.L.C. at 331-32 n.5.

Recent deployments ordered solely on the basis of the President's constitutional authority have also been extremely large, representing a substantial commitment of the Nation's military personnel, diplomatic prestige, and financial resources. On at least one occasion, such a unilateral deployment has constituted full-scale war. On March 24, 1999, without any prior statutory authorization and in the absence of an attack on the United States, President Clinton ordered hostilities to be initiated against the Republic of Yugoslavia. The President informed Congress that, in the

initial wave of air strikes, "United States and NATO forces have targeted the [Yugoslavian] government's integrated air defense system, military and security police command and control elements, and military and security police facilities and infrastructure. . . . I have taken these actions pursuant to my constitutional authority to conduct U.S. foreign relations and as Commander in Chief and Chief Executive." Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro), 1 *Pub. Papers of Pres. William J. Clinton* 459, 459-60 (Mar. 26, 1999). Bombing attacks against targets in both Kosovo and Serbia ended on June 10, 1999, seventy-nine days after the war began. More than 30,000 United States military personnel participated in the operations; some 800 U.S. aircraft flew more than 20,000 sorties; more than 23,000 bombs and missiles were used. As part of the peace settlement, NATO deployed some 50,000 troops into Kosovo, 7,000 of them American.[15] In a News Briefing on June 10, 1999, Secretary of Defense William S. Cohen summarized the effects of the campaign by saying,

> [t]hree months ago Yugoslavia was a heavily armed country with a significant air defense system. We reduced that defense system threat by destroying over 80 percent of Yugoslavia's modern aircraft fighters and strategic suface-to-air missiles. NATO destroyed a significant share of the infrastructure Yugoslavia used to support[] its military with, we reduced [its] capacity to make ammunition by two-thirds, and we eliminated all of its oil refining capacity and more than 40 percent of its military fuel supplies. Most important, we severely crippled the military forces in Kosovo by destroying more than 50 percent of the artillery and more than one-third of the armored vehicles.[16]

General Shelton of the Joint Chiefs of Staff reported that "about half of [Yugoslavia's] defense industry has either been damaged or destroyed. . . . [A]viation, 70 percent; armored vehicle production, 40 [percent]; petroleum refineries, 100 percent down; explosive production, about 50 percent; and 65 percent of [its] ammunition. . . . For the most part Belgrade is a city that's got about probably 70

---

[15] *See Campbell v. Clinton*, 203 F.3d at 40 (Tatel, J., concurring) (quoting testimony of Secretary of Defense Cohen that "'[w]e're certainly engaged in hostilities [in Yugoslavia], we're engaged in combat'"); Exec. Order No. 13119, 64 Fed. Reg. 18,797 (Apr. 16, 1999) (designating March 24, 1999, as "the date of the commencement of combatant activities" in Yugoslavia); John C. Yoo, *UN Wars, US War Powers*, 1 Chi. J. Int'l L. 355 (2000).

[16] Office of the Assistant Secretary of Defense (Public Affairs), *DoD News Briefing* (June 10, 1999, 4:05 PM) (remarks of Secretary of Defense Cohen), *available at* http://www.defense.gov/transcripts/transcript.aspx?transcriptid=487 (last visited Apr. 27, 2012).

percent without [electrical] power."[17] A report by General Ryan, Air Force Chief of Staff, stated that

> Serbia's air force is essentially useless and its air defenses are dangerous but ineffective. Military armament production is destroyed. Military supply areas are under siege. Oil refinement has ceased and petroleum storage is systematically being destroyed. Electricity is sporadic, at best. Major transportation routes are cut.
>
> NATO aircraft are attacking with impunity throughout the country.[18]

Estimates near the time placed the number of Yugoslav military casualties at between five and ten thousand.[19] In recent decades, no President has unilaterally deployed so much force abroad.

Other recent unilateral deployments have also been significant in military, foreign policy, and financial terms. Several such deployments occurred in the Balkans in the mid-1990s.[20] In December 1995, President Clinton ordered the deployment of 20,000 United States troops to Bosnia to implement a peace settlement. In February 1994, sixty United States warplanes conducted airstrikes against Yugoslav targets. In 1993, United States warplanes were sent to enforce a no-fly zone over Bosnia; in the same year, the President despatched United States troops to Macedonia as part of a United Nations peacekeeping operation.

Major recent deployments have also taken place in Central America and in the Persian Gulf. In 1994, President Clinton ordered some 20,000 United States troops to be deployed into Haiti, again without prior statutory authorization from Congress, in reliance solely upon his Article II authority. *See Deployment of United States Armed Forces into Haiti*, 18 Op. O.L.C. 173 (1994). On August 8, 1990, in response to the Iraqi invasion of Kuwait and the consequent threat to Saudi Arabia, President Bush ordered the deployment of substantial forces into Saudi Arabia in Operation Desert Shield. The forces were equipped for combat and included two squadrons of F-15 aircraft and a brigade of the 82d Airborne Division; the deployment eventually grew to several hundred thousand. The President informed Congress that he had taken these actions "pursuant to my constitutional authority to conduct our foreign relations and as Commander in Chief." Letter to Congressional Leaders on the Deployment of United States Armed Forces to Saudi Arabia and the Middle East, 2 *Pub. Papers of Pres.*

---

[17] *Id*. (remarks of General Shelton).

[18] General Michael E. Ryan, *Air Power Is Working in Kosovo*, Wash. Post, June 4, 1999, at A35.

[19] *See* Nick Cook, *War of Extremes*, Jane's Defence Weekly, July 7, 1999, at 21.

[20] *See* Yoo, *UN Wars*, 1 Chi. J. Int'l L. at 359.

*George Bush* 1116, 1116 (Aug. 9, 1990). President Bush also deployed some 15,000 troops into Panama in December, 1990, for the purpose (among others) of protecting Americans living in Panama. *See* Address to the Nation Announcing United States Military Action in Panama, 2 *Pub. Papers of Pres. George Bush* 1722 (Dec. 20, 1989); *see generally* Abraham D. Sofaer, *The Legality of the United States Action in Panama*, 29 Colum. J. Transnat'l L. 281 (1991).

Further, when Congress has in fact authorized deployments of troops in hostilities, past Presidents have taken the position that such legislation, although welcome, was not constitutionally necessary. For example, in signing Public Law 102-01, 105 Stat. 3 (1991), authorizing the use of military force in Operation Desert Storm against Iraq, President Bush stated that "my request for congressional support did not, and my signing this resolution does not, constitute any change in the longstanding positions of the executive branch on either the President's constitutional authority to use the Armed Forces to defend vital U.S. interests or the constitutionality of the War Powers Resolution." Statement on Signing the Resolution Authorizing the Use of Military Force Against Iraq, 1 *Pub. Papers of Pres. George Bush* 40, 40 (Jan. 14, 1991).[21] Similarly, President John F. Kennedy stated on September 13, 1962, that congressional authorization for a naval blockade of Cuba was unnecessary, maintaining that "I have full authority now to take such action." The President's News Conference of September 13, 1962, *Pub. Papers of Pres. John F. Kennedy* 674, 674 (1962). And in a report to the American people on October 22, 1962, President Kennedy asserted that he had ordered the blockade "under the authority entrusted to me by the Constitution *as endorsed by* the resolution of the Congress." Radio and Television Report to the American People on the Soviet Arms Buildup in Cuba, *Pub. Papers of Pres. John F. Kennedy* 806, 807 (Oct. 22, 1962) (emphasis added).[22] Thus, there is abundant

---

[21] Further, in a press conference on January 9, 1991, President Bush was asked if he believed that he needed congressional authorization in order to begin offensive operations against Iraq. He answered, "I don't think I need it. I think Secretary Cheney expressed it very well the other day. There are different opinions on either side of this question, but Saddam Hussein should be under no question on this: I feel that I have the authority to fully implement the United Nations resolutions." The President's News Conference on the Persian Gulf Crisis, 1 *Pub. Papers of Pres. George Bush* 17, 20 (Jan. 9, 1991).

[22] An unsigned, unaddressed opinion in this Office's files, entitled *Blockade of Cuba*, states that "the President, in the exercise of his constitutional power as Commander-in-Chief, can order a blockade without prior Congressional sanction and without a declaration of war by Congress." *Id*. at 9 (Oct. 19, 1962). Thus, the writers of the memorandum (presumably, either this Office or the State Department's Office of the Legal Adviser) determined that no congressional authorization either existed or was necessary for the blockade ordered by President Kennedy.

Editor's Note: Prior to the book publication of this opinion, we consulted with officials at the Department of State to determine whether they had any record or evidence of authorship of the *Blockade of Cuba* memorandum. Although they were unable to locate a copy of the memorandum itself, they pointed us to declassified records of a meeting held on October 19, 1962 (the same date as the memorandum) and attended by a number of top-level administration officials (including Secretary of State Dean Rusk, Attorney General Robert Kennedy, and National Security Advisor McGeorge

precedent, much of it from recent Administrations, for the deployment of military force abroad, including the waging of war, on the basis of the President's sole constitutional authority.

Several recent precedents stand out as particularly relevant to the situation at hand, where the conflict is with terrorists. The first and most relevant precedent is also the most recent: the military actions that President William J. Clinton ordered on August 20, 1998, against terrorist sites in Afghanistan and Sudan. The second is the strike on Iraqi Intelligence Headquarters that President Clinton ordered on June 26, 1993. The third is President Ronald Reagan's action on April 14, 1986, ordering United States armed forces to attack selected targets at Tripoli and Benghazi, Libya.

## A.

On August 20, 1998, President Clinton ordered the Armed Forces to strike at terrorist-related facilities in Afghanistan and Sudan "because of the threat they present to our national security." Remarks in Martha's Vineyard, Massachusetts, on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 *Pub. Papers of Pres. William J. Clinton* 1460, 1460 (Aug. 20, 1998). The President stated that the purpose of the operation was "to strike at the network of radical groups affiliated with and funded by Usama bin Ladin, perhaps the preeminent organizer and financier of international terrorism in the world today." Address to the Nation on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 *Pub. Papers of Pres. William J. Clinton* 1460, 1460 (Aug. 20, 1998). The strike was ordered in retaliation for the bombings of United States Embassies in Kenya and Tanzania, in which bin Laden's organization and groups affiliated with it were believed to have played a key role and which had caused the deaths of some 12 Americans and nearly 300 Kenyans and Tanzanians, and in order to deter later terrorist attacks of a similar kind against United States nationals and others. In his remarks at Martha's Vineyard, President Clinton justified the operation as follows:

---

Bundy). *See* U.S. Dep't of State, *Foreign Relations of the United States, 1961-1963: Volume XI, Cuban Missile Crisis and Aftermath*, doc. 31 (Edward C. Keefer et al., eds., 1998), *available at* http://history. state.gov/historicaldocuments/frus1961-63v11/d31 (last visited Aug. 3, 2012) (notes of October 19, 1962 meeting). These records suggest that the memorandum may have been prepared by Leonard Meeker, Deputy Legal Adviser for the Department of State, perhaps in consultation with Nicholas Katzenbach, Deputy Attorney General and former Assistant Attorney General for the Office of Legal Counsel. Mr. Meeker kept notes of the October 19 meeting, which indicate that he presented legal analysis paralleling that in the *Blockade of Cuba* memorandum and concluding that the President could respond militarily to the Soviet missile threat without a declaration of war. Mr. Katzenbach also spoke at the meeting and concurred with Mr. Meeker that "the President had ample constitutional and statutory authority to take any needed military measures." *Id*.

> I ordered this action for four reasons: first, because we have con-
> vincing evidence these groups played the key role in the Embassy
> bombings in Kenya and Tanzania; second, because these groups
> have executed terrorist attacks against Americans in the past; third,
> because we have compelling information that they were planning
> additional terrorist attacks against our citizens and others with the
> inevitable collateral casualties we saw so tragically in Africa; and
> fourth, because they are seeking to acquire chemical weapons and
> other dangerous weapons.

Remarks in Martha's Vineyard, 2 *Pub. Papers of Pres. William J. Clinton* at 1460 (1998). In his Address to the Nation on the same day, the President made clear that the strikes were aimed not only at bin Laden's organization, but at other terrorist groups thought to be affiliated with it, and that the strikes were intended as retribution for other incidents caused by these groups, and not merely the then-recent bombings of the two United States embassies. Referring to the past acts of the interlinked terrorist groups, he stated:

> Their mission is murder and their history is bloody. In recent
> years, they killed American, Belgian, and Pakistani peacekeepers in
> Somalia. They plotted to assassinate the President of Egypt and the
> Pope. They planned to bomb six United States 747's over the Pacif-
> ic. They bombed the Egyptian Embassy in Pakistan. They gunned
> down German tourists in Egypt.

Address to the Nation, 2 *Pub. Papers of Pres. William J. Clinton* at 1460-61 (1998). Furthermore, in explaining why military action was necessary, the President noted that "law enforcement and diplomatic tools" to combat terrorism had proved insufficient, and that "when our very national security is challenged . . . we must take extraordinary steps to protect the safety of our citizens." *Id.* at 1461. Finally, the President made plain that the action of the two targeted countries in harboring terrorists justified the use of military force on their territory: "The United States does not take this action lightly. Afghanistan and Sudan have been warned for years to stop harboring and supporting these terrorist groups. But countries that persistently host terrorists have no right to be safe havens." *Id.*

The terrorist incidents of September 11, 2001, were surely far graver a threat to the national security of the United States than the 1998 attacks on our embassies (however appalling those events were). The President's power to respond militarily to the later attacks must be correspondingly broader. Nonetheless, President Clinton's action in 1998 illustrates some of the breadth of the President's power to act in the present circumstances.

First, President Clinton justified the targeting of particular groups on the basis of what he characterized as "convincing" evidence of their involvement in the

embassy attacks. While that is not a standard of proof appropriate for a criminal trial, it is entirely appropriate for military and political decisionmaking. Second, the President targeted not merely one particular group or leader, but a network of affiliated groups. Moreover, he ordered the action not only because of particular attacks on United States embassies, but because of a pattern of terrorist activity, aimed at both Americans and non-Americans, that had unfolded over several years. Third, the President explained that the military action was designed to deter *future* terrorist incidents, not only to punish past ones. Fourth, the President specifically justified military action on the territory of two foreign states because their governments had "harbor[ed]" and "support[ed]" terrorist groups for years, despite warnings from the United States.

## B.

On June 26, 1993, President Clinton ordered a Tomahawk cruise missile strike on Iraqi Intelligence Service (the "IIS") headquarters in Baghdad. The IIS had planned an unsuccessful attempt to assassinate former President Bush in Kuwait in April, 1993. Two United States Navy surface ships launched a total of 23 missiles against the IIS center.

In a letter to Congress, the President referred to the failed assassination attempt and stated that "[t]he evidence of the Government of Iraq's violence and terrorism demonstrates that Iraq poses a continuing threat to United States nationals." Letter to Congressional Leaders on the Strike on Iraqi Intelligence Headquarters, 1 *Pub. Papers of Pres. William J. Clinton* 940, 940 (June 28, 1993). He based his authority to order a strike against the Iraqi government's intelligence command center on "my constitutional authority with respect to the conduct of foreign relations and as Commander in Chief," as well as on the Nation's inherent right of self-defense. *Id.*

President Clinton's order was designed in part to deter and prevent future terrorist attacks on the United States—and most particularly future assassination attempts on former President Bush. Although the assassination attempt had been frustrated by the arrest of sixteen suspects before any harm was done, "nothing prevented Iraq from directing a second—possibly successful—attempt on Bush's life. Thus, the possibility of another assassination plot was 'hanging threateningly over [Bush's] head' and was therefore imminent. By attacking the Iraqi Intelligence Service, the United States hoped to prevent and deter future attempts to kill Bush."[23]

---

[23] Robert F. Teplitz, *Taking Assassination Attempts Seriously: Did the United States Violate International Law in Forcefully Responding to the Iraqi Plot to Kill George Bush?*, 28 Cornell Int'l L.J. 569, 609 (1995) (citation omitted).

## C.

On April 14, 1986, President Ronald Reagan, acting on his independent authority, ordered United States armed forces to engage in military action against the government of Colonel Gadhafi of Libya.[24] Thirty-two American aircraft attacked selected targets at Tripoli and Benghazi, Libya. Libyan officials reported thirty-seven people killed and an undetermined number injured. More than sixty tons of ordnance were used during the attack.

For some time Libya had supported terrorist groups and organizations and indeed had itself ordered direct terrorist attacks on the United States.

> Under Gaddafi, Libya has declared its support of "national liberation movements" and has allegedly financed and trained numerous terrorist groups and organizations, including Palestinian radicals, Lebanese leftists, Columbia's M-19 guerrillas, the Irish Republican Army, anti-Turkish Armenians, the Sandinistas in Nicaragua, Muslim rebels in the Philippines, and left-wing extremists in Europe and Japan.[25]

It had harbored a variety of terrorists, including Abu Nidal and the three surviving members of the Black September group that had killed eleven Israeli athletes at the 1972 Munich Olympic Games.[26] Libya's attacks on the United States included the murder of two United States diplomats in Khartoum (1973), the attempted assassination of Secretary of State Kissinger (1973), the burning of the United States Embassy in Tripoli (1979), the planned assassination of President Reagan, Secretary of State Haig, Secretary of Defense Weinberger, and Ambassador to Italy Robb (1981), and the hijacking of T.W.A. flight 847 (1985).[27] Libya had also been linked to terrorist events close to the time of the April, 1986, airstrike in which Americans and others had lost their lives. In January, 1986, American intelligence tied Libya to the December 27, 1985, bombings at the Rome and Vienna airports in which nineteen people, including 5 Americans, had died, and one hundred and twelve persons had been injured.

The particular event that triggered the President's military action had occurred on April 5, 1986, when a bomb exploded in the "Labelle," a Berlin discotheque frequented by U.S. military personnel. The blast killed three people (two Americans) and injured two hundred and thirty others (including seventy-nine Ameri-

---

[24] *See generally* Wallace F. Warriner, U.S.M.C., *The Unilateral Use of Coercion Under International Law: A Legal Analysis of the United States Raid on Libya on April 14, 1986*, 37 Naval L. Rev. 49 (1988); Teplitz, 28 Cornell Int'l. J. at 583-86.

[25] Teplitz, 28 Cornell Int'l L. J. at 583 n.112.

[26] *See id*.

[27] *See id*. at 583 n.113.

cans). Intelligence reports indicated that the bombing was planned and executed under the direct orders of the Government of Libya. The United States Ambassador to the United Nations stated that there was "direct, precise, and irrefutable evidence that Libya bears responsibility" for the bombing of the discotheque; that the Labelle incident was "only the latest in an ongoing pattern of attacks by Libya" against the United States and its allies; and that the United States had made "repeated and protracted efforts to deter Libya from its ongoing attacks," including "quiet diplomacy, public condemnation, economic sanctions and demonstrations of military force." U.N. SCOR, 2674th mtg. at 13, 14, U.N. Doc. S/PV.2674 (prov. ed. Apr. 15, 1986).

Like the two unilateral presidential actions discussed above, President Reagan's decision to use armed force in response to a terrorist attack on United States military personnel illustrates that the President has independent constitutional authority to use such force in the present circumstances.

## IV.

Our analysis to this point has surveyed the views and practice of the Executive and Judicial Branches. In two enactments, the War Powers Resolution and the recent Joint Resolution, Congress has also addressed the scope of the President's independent constitutional authority. We think these two statutes demonstrate Congress's acceptance of the President's unilateral war powers in an emergency situation like that created by the September 11 incidents.

Furthermore, the President can be said to be acting at the apogee of his powers if he deploys military force in the present situation, for he is operating both under his own Article II authority and with the legislative support of Congress. Under the analysis outlined by Justice Jackson in *Youngstown Sheet & Tube Co*. (and later followed and interpreted by the Court in *Dames & Moore*), the President's power in this case would be "at its maximum," 343 U.S. at 635 (Jackson, J., concurring), because the President would be acting pursuant to an express congressional authorization. He would thus be clothed with "all [authority] that he possesses in his own right plus all that Congress can delegate," *id*., in addition to his own broad powers in foreign affairs under Article II of the Constitution.

*The War Powers Resolution*. Section 2(c) of the WPR, reads as follows:

> The constitutional powers of the President as Commander-in-Chief to introduce United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, are exercised only pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) *a national emergency created by attack upon the United States, its territories or possessions, or its armed forces*.

50 U.S.C. § 1541(c) (2000) (emphasis added).

The Executive Branch consistently "has taken the position from the very beginning that section 2(c) of the WPR does not constitute a legally binding definition of Presidential authority to deploy our armed forces." *Overview of the War Powers Resolution*, 8 Op. O.L.C. at 274.[28] Moreover, as our Office has noted, "even the defenders of the WPR concede that this declaration [in section 2(c)]—found in the 'Purpose and Policy' section of the WPR—either is incomplete or is not meant to be binding." *Deployment of United States Armed Forces into Haiti*, 18 Op. O.L.C. at 176; *accord* Bosnia Opinion, 19 Op. O.L.C. at 335 ("The executive branch has traditionally taken the position that the President's power to deploy armed forces into situations of actual or indicated hostilities is not restricted to the three categories specifically marked out by the Resolution."); *Presidential Powers Relating to the Situation in Iran*, 4A Op. O.L.C. at 121 ("[T]he Resolution's policy statement is not a comprehensive or binding formulation of the President's powers as Commander-in-Chief."). Nonetheless, section 2(c)(3) correctly identifies *one*, but by no means the only, presidential authority to deploy military forces into hostilities.[29] In the present circumstances, the statute signifies Congress's recognition that the President's constitutional authority alone would enable him to take military measures to combat the organizations or groups responsible for the September 11 incidents, together with any governments that may have harbored or supported them.

Further, Congress's support for the President's power suggests no limits on the Executive's judgment whether to use military force in response to the national emergency created by those incidents. Section 2(c)(3) leaves undisturbed the President's constitutional authority to determine both when a "national emergency" arising out of an "attack against the United States" exists, and what types and levels of force are necessary or appropriate to respond to that emergency. Because the statute itself supplies no definition of these terms, their interpretation must depend on longstanding constitutional practices and understandings. As we have shown in parts I-III of this memorandum, constitutional text, structure and practice demonstrate that the President is vested with the plenary power to use military

---

[28] Thus, the State Department took the view, in a letter of November 30, 1973, that section 2(c) was a "declaratory statement of policy." 8 Op. O.L.C. at 274. Further, in 1975, the Legal Adviser to the State Department listed six (non-exclusive) situations, not enumerated in section 2(c), in which the President had independent constitutional authority to deploy troops without either a declaration of war or specific statutory authorization. *See id.* at 274-75.

[29] We note that section 2(c) cannot itself qualify as a statutory authorization to act in national emergencies. It is rather a congressional acknowledgment of the President's *non*statutory, Article II-based powers. Section 8(d)(2) of the WPR, 50 U.S.C. § 1547(d)(2) (2000), specifically provides that nothing in the WPR "shall be construed as granting any authority to the President . . . which authority he would not have had in the absence of this [joint resolution]."

force, especially in the case of a direct attack on the United States. Section 2(c)(3) recognizes the President's broad authority and discretion in this area.

Given the President's constitutional powers to respond to national emergencies caused by attacks on the United States, and given also that section 2(c)(3) of the WPR does not attempt to define those powers, we think that that provision must be construed simply as a recognition of, and support for, the President's pre-existing constitutional authority. Moreover, as we read the WPR, action taken by the President pursuant to the constitutional authority recognized in section 2(c)(3) cannot be subject to the substantive requirements of the WPR, particularly the interrelated reporting requirements in section 4 and the "cut off" provisions of section 5, 50 U.S.C. §§ 1543-1544.[30] Insofar as the Constitution vests the power in the President to take military action in the emergency circumstances described by section 2(c)(3), we do not think it can be restricted by Congress through, e.g., a requirement that the President either obtain congressional authorization for the action within a specific time frame, or else discontinue the action. Were this not so, the President could find himself unable to respond to an emergency that outlasted a statutory cut-off, merely because Congress had failed, for whatever reason, to enact authorizing legislation within that period.

To be sure, some interpreters of the WPR take a broader view of its scope. But on *any* reasonable interpretation of that statute, it must reflect an explicit understanding, shared by both the Executive and Congress, that the President may take *some* military actions—including involvement in hostilities—in response to emergencies caused by attacks on the United States. Thus, while there might be room for disagreement about the scope and duration of the President's emergency powers, there can be no reasonable doubt as to their *existence*.

*The Joint Resolution of September 14, 2001*. Whatever view one may take of the meaning of section 2(c)(3) of the WPR, we think it clear that Congress, in enacting the "Joint Resolution [t]o authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States," Pub. L. No. 107-40, 115 Stat. 224 (2001), has confirmed that the President has broad constitutional authority to respond, by military means or otherwise, to the incidents of September 11.

First, the findings in the Joint Resolution include an express statement that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id*. This authority is in

---

[30] True, the reporting requirement in section 4(a)(1) purports to apply to any case in which U.S. armed forces are introduced into hostilities "[i]n the absence of a declaration of war." 50 U.S.C. § 1543(a)(1). Further, the "cut off" provisions of section 5 are triggered by the report required by section 4(a)(1). Thus, the language of the WPR indicates an intent to reach action taken by the President pursuant to the authority recognized in section 2(c)(3), if no declaration of war has been issued. We think, however, that it would be beyond Congress's power to regulate the President's emergency authority in the manner prescribed by sections 4(a)(1) and 5.

addition to the President's authority to respond to *past* acts of terrorism. In including this statement, Congress has provided its explicit agreement with the Executive Branch's consistent position, as articulated in Parts I-III of this memorandum, that the President has the plenary power to use force even before an attack upon the United States actually occurs, against targets and using methods of his own choosing.

Second, Congress also found that there is a "threat to the national security and foreign policy of the United States posed by the[] grave acts of violence" on September 11, and that "such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy" of this country. Insofar as "the President's independent power to act depends upon the gravity of the situation confronting the nation," *Youngstown Sheet & Tube*, 343 U.S. at 662 (Clark, J., concurring in judgment), these findings would support any presidential determination that the September 11 attacks justified the use of military force in response. Further, they would buttress any presidential determination that the nation is in a state of emergency caused by those attacks. The Constitution confides in the President the authority, independent of any statute, to determine when a "national emergency" caused by an attack on the United States exists.[31] Nonetheless, congressional concurrence is welcome in making clear that the branches agree on the seriousness of the terrorist threat currently facing the Nation and on the justifiability of a military response.

Third, it should be noted here that the Joint Resolution is somewhat narrower than the President's constitutional authority. The Joint Resolution's authorization to use force is limited only to those individuals, groups, or states that planned, authorized, committed, or aided the attacks, and those nations that harbored them. It does not, therefore, reach other terrorist individuals, groups, or states, which cannot be determined to have links to the September 11 attacks. Nonetheless, the President's broad constitutional power to use military force to defend the Nation, recognized by the Joint Resolution itself, would allow the President to take whatever actions he deems appropriate to pre-empt or respond to terrorist threats from new quarters.

---

[31] *See Prize Cases*, 67 U.S. at 670 (whether a state of belligerency justifying a blockade exists is to be decided by the President); *see also Sterling v. Constantin*, 287 U.S. 378, 399 (1932) ("By virtue of his duty to 'cause the laws to be faithfully executed', the Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen."); *Moyer v. Peabody*, 212 U.S. 78, 83 (1909) ("[T]he governor's declaration that a state of insurrection existed is conclusive of that fact."); *Campbell*, 203 F.3d at 26-27 (Silberman, J., concurring) (The Court in the *Prize Cases* "made clear that it would not dispute the President on measures necessary to repel foreign aggression."); *cf. Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827) (President had unreviewable discretion to determine when "emergency" existed under statute enabling him to call up militia).

## V.

In light of the text, plan, and history of the Constitution, its interpretation by both past Administrations and the courts, the longstanding practice of the Executive Branch, and the express affirmation of the President's constitutional authorities by Congress, we think it beyond question that the President has the plenary constitutional power to take such military actions as he deems necessary and appropriate to respond to the terrorist attacks upon the United States on September 11, 2001. Force can be used both to retaliate for those attacks, and to prevent and deter future assaults on the Nation. Military actions need not be limited to those individuals, groups, or states that participated in the attacks on the World Trade Center and the Pentagon: the Constitution vests the President with the power to strike terrorist groups or organizations that cannot be demonstrably linked to the September 11 incidents, but that, nonetheless, pose a similar threat to the security of the United States and the lives of its people, whether at home or overseas.[32] In both the War Powers Resolution and the Joint Resolution, Congress has recognized the President's authority to use force in circumstances such as those created by the September 11 incidents. Neither statute, however, can place any limits on the President's determinations as to any terrorist threat, the amount of military force to be used in response, or the method, timing, and nature of the response. These decisions, under our Constitution, are for the President alone to make.

JOHN C. YOO
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[32] We of course understand that terrorist organizations and their state sponsors operate by secrecy and concealment, and that it is correspondingly difficult to establish, by the standards of criminal law or even lower legal standards, that particular individuals or groups have been or may be implicated in attacks on the United States. Moreover, even when evidence sufficient to establish involvement *is* available to the President, it may be impossible for him to disclose that evidence without compromising classified methods and sources, and so damaging the security of the United States. *See, e.g.*, *Chicago & Southern Air Lines*, 333 U.S. at 111 ("The President . . . has available intelligence services whose reports are not and ought not to be published to the world."); *see also* Ruth Wedgwood, *Responding to Terrorism: The Strikes Against Bin Laden*, 24 Yale J. Int'l L. 559, 568-74 (1999) (analyzing difficulties of establishing and publicizing evidence of causation of terrorist incidents). But we do not think that the difficulty or impossibility of establishing proof to a criminal law standard (or of making evidence public) bars the President from taking such military measures as, in his best judgment, he thinks necessary or appropriate to defend the United States from terrorist attacks. In the exercise of his plenary power to use military force, the President's decisions are for him alone and are unreviewable.